**Richard MATULLO, Appellant,**

v.

**Otis R. BOWEN, Secretary.**

**No. 90–5510.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Nov. 14, 1990.

Decided Nov. 26, 1990.

Sheryl Gandel Mazur, West Caldwell, N.J., for appellant.

Michael Chertoff, U.S. Atty., Antony J. Labruna, Jr., Sp. Asst. U.S. Atty., Newark, N.J., for appellee.

Before STAPLETON, HUTCHINSON, and ROSENN, Circuit Judges.

OPINION OF THE COURT

ROSENN, Circuit Judge.

Appellant Richard Matullo is a high school graduate who was born on June 1, 1949, and currently lives with his mother. Matullo first applied for Social Security Disability Insurance benefits on July 23, 1983.[1] On June 29, 1987, a hearing was held before an Administrative Law Judge (ALJ) who found that appellant was not under a disability at any time through March 31, 1983. That decision became the final decision of the Secretary of Health and Human Services when, on February 16, 1988, the Appeals Council denied appellant's request for review. The district court affirmed, holding that substantial evidence in the record supported the Secretary's decision. Matullo appealed. We affirm.

I.

Appellant testified that he last worked on December 30, 1978, as a corrections officer. This job involved guarding inmates, taking them to and from lock-up and appellant was required to carry a gun. Appellant testified that he resigned from this job because the warden threatened to fire him when he found out that he was on Methadone. This allegation was not documented. Appellant testified that after leaving his job as a corrections officer, he attempted to work pumping gas but was precluded by his reoccurring headaches.

Prior to working as a corrections officer, appellant worked as a boom operator at Bamberger's warehouse from 1967 to 1973, operating a forklift truck to move large rugs. Before working at Bamberger's, appellant was in the National Guard. Appellant testified he was discharged as a result of heroin use.

Appellant has a history of substance abuse. The evidence is conflicting as to when he started using heroin. Appellant testified that he began using heroin at age fourteen but also told Fair Oaks Hospital that he began using one year ago when he was admitted for treatment of addiction on September 28, 1970. Appellant voluntarily entered the Fair Oaks Hospital; there was a note of previous treatment attempt in May or June of 1970 at Mount Carmel Guild as well. Fair Oaks Hospital personnel reported appellant to be quiet and cooperative, answered all questions logically and relevantly, and that there was no evidence of delusional material. On October 15, 1970, Matullo was discharged in an asymptomatic condition, at his own request, with the agreement that he would participate in a drug rehabilitation program. Appellant has been on Methadone maintenance since 1970.

Appellant alleges that he was in a car accident in 1969 or 1970 in which he sustained head trauma. Subsequent to the accident, appellant started having headaches once or twice a week and started treatment with Dr. Della Ferra. Dr. Della Ferra treated the appellant from 1970 to 1978. In a report prepared in 1984, Dr. Della Ferra diagnosed appellant as having lumbo-sacral pain, drug addiction (under care), and as emotionally unstable at times. The doctor also noted that the appellant had mental lapses and psychomotor disturbance.

Since the accident, pharmacy records and the appellant's testimony show extensive use of Valium, Noludar, and Fiorinal prescribed for headaches and insomnia. In 1977, appellant was hospitalized for 14 days for detoxification from prescription Valium and Noludar.

Appellant alleges that he attempted suicide sometime in 1978 after his father died. There is no documentation of this.

On May 8, 1979, appellant was admitted to St. Michael's Medical Center for an overdose of Noludar. He told a psychiatrist that he overdosed trying to get high and that in the past he had taken as many as 25 Noludar and 15 Valium without complica-

---

1. Concurrent with the filing of his application for disability benefits, appellant also applied for Supplemental Security Income benefits which were subsequently paid to the appellant. The Secretary found that appellant was disabled beginning on September 1, 1985. The SSI application is not at issue in the instant action.

tions. He did not appear to be delusional or suicidal. Appellant underwent an electroencephalogram ("EEG"), a CT–scan, and a brain scan, all of which were negative.

Dr. D'Aconti treated appellant from 1979 to 1987 monthly for headaches. Dr. D'Aconti reported that they were unable to determine the origin of the headaches without a neurological work-up and that the only basis of his diagnosis was his clinical complaints and a psychological profile. Treatment with Fiorinal provided temporary relief for the appellant's headaches.

Appellant testified that he was in another car accident in 1978 that caused his headaches to become worse. There is no documentation of this accident. Appellant also testified that he was mugged in 1979 and was hit over the head which made his headaches worse.

In August of 1981, appellant was seen at the Newark Health Clinic where he was prescribed Dilantin and Phenobarbital for seizures of which he complained.

In January of 1985, appellant either fell down or was mugged and received stitches. Appellant claims that this injury also caused his headaches to become more severe and frequent. In July of 1985, Matullo was taken by ambulance to Columbus Hospital in Newark, New Jersey. However, Matullo refused treatment and voluntarily walked out. Hospital personnel noted that Matullo had a possible alcoholic withdrawal.

Appellant describes his condition as the following: he was experiencing severe headaches once or twice a week until 1978 when they increased to three or four times a week. He testified that when he has a headache, he stays in a dark room, takes medication, puts cold compresses on his head and does not eat. Appellant testified that he does not like crowds because it seems like everything is closing in on him.

*Medical Evaluations*

On September 24, 1984, Dr. DiLallo, an internist, examined the appellant and found his headaches to be vascular type and recommended that different medications should be tried to obtain prophylactic relief.

The report concluded that the patient would not be precluded from gainful employment at that time.

The first psychological evaluation of the appellant occurred in September of 1984. Dr. Sukhedo found the appellant to have a typical sociopathic personality. Appellant complained of headaches, nerves, and inability to sleep. The doctor found his ability to relate to others was exceptionally good. The patient appeared very relaxed, there was no sense of suspicion, nervousness, anxiety or fearfulness. In his speech, there was no poverty of thought, blocking, or flight of ideas. A slightly anxious effect was displayed, but appellant attempted to cover up his anxiety with smooth mannerisms. His recent memory was excellent and his judgment and abstract thinking were very good. Dr. Sukhedo had the impression that the patient's headaches were a way for the patient to receive prescription drugs to make up his need for more Methadone or heroin.

A second evaluation was performed by Dr. Patrawalla in January of 1985. Dr. Patrawalla found the appellant's thinking process to be evasive, his intelligence average, and that he seemed to be trying to "make this interview sick enough to get the benefits." Appellant's recent memory was impaired and he made multiple mistakes on both serial subtraction and on the repeating the digits test. The doctor found appellant did not suffer from suicidal thoughts, agitation, psychomotor disturbance, or hallucinations. Appellant stated that he cooked his meals, cleaned the house, and visited with friends. Dr. Patrawalla recommended that he be referred to vocational rehabilitation to be trained for some occupation.

In September of 1985, Dr. Friedman evaluated the appellant and found him to be mildly retarded. Appellant also showed signs of depression in addition to signs of somatization disorder and of hypocondriasis. He had suicidal ideations, sleep disturbances and a generally dysphoric mood.

Dr. Cruz evaluated the appellant in March of 1986 and diagnosed an anxiety disorder.

In May of 1986, Dr. Sozzi found that appellant was unable to work on a regular basis in a competitive work situation.. The doctor found that routine activities of daily living are mostly perserved, but there was a marked functional limitation in the area of attention, concentration, comprehension, persistence, socialization, and stress tolerance. Dr. Sozzi concluded that no significant improvement could be reasonably anticipated in the foreseeable future and that the patient would most likely decompensate under the stress of customary work pressure.

## II.

The sole issue on appeal is whether substantial evidence supports the Secretary's decision that appellant was not disabled on or before March 31, 1983. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir.1988). Substantial evidence has been defined as "more than a mere scintilla" and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). .

To be eligible for disability insurance benefits under the Social Security Act, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant is considered to be unable to engage in any substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Secretary's regulations provide a 5 step sequential evaluation process for de-termining whether or not a claimant is under a disability. 20 C.F.R. § 404.1520. Step 1 states that an individual who is working will not be found to be disabled regardless of medical findings. 20 C.F.R. § 404.1520(b). Step 2 involves evaluating severe impairments. 20 C.F.R. § 404.1520(c). Step 3 requires determining whether the claimant has an impairment or impairments which meets or equals a listed impairment in Appendix 1. 20 C.F.R. § 404.1520(d). Step 4 states that if an individual is capable of performing past relevant work, he will not be found to be disabled. 20 C.F.R. § 404.1520(e). Step 5 requires that if an individual cannot perform past relevant work, other factors must be considered to determine if other work in the national economy can be performed. 20 C.F.R. § 404.1520(f).

Under 20 C.F.R. § 404.131, appellant is required to establish that he became disabled prior to the expiration of his insured status. *See also Lombardo v. Schweiker*, 749 F.2d 565, 567 (9th Cir.1984). Appellant met the disability insured status requirements of the Act on December 31, 1978, the date he alleged he became unable to work, and continued to meet them through March 31, 1983, but not thereafter. The ALJ found that the appellant's impairments did not prevent him from performing his past relevant work on or before March 31, 1983, and that he was not under a disability as defined in the Social Security Act at any time through March 31, 1983.

## III.

The appellant presents a number of confused and mixed arguments as to why the ALJ's decision is not supported by substantial evidence. Namely, appellant argues that the ALJ failed to make proper evaluations under Steps 3 and 4. 20 C.F.R. § 404.1520(d) and (e). Appellant claims that the ALJ failed to review his alleged substance abuse, headaches, and mental impairment in combination to determine whether they met or equaled a listed impairment. Although appellant pads his argument with medical evidence relating to appellant's condition after March of 1983,

close examination reveals that there is little in the record substantiating appellant's testimony regarding his condition in the pertinent time frame. Appellant wishes us to ignore that the ALJ discredited the appellant's testimony regarding the severity of his symptoms and for us to make a finding of equivalency based on appellant's unsubstantiated testimony.

The ALJ found that there was "very minimal information concerning the claimant's impairments prior to September 1984." With regard to drug abuse, the ALJ noted that appellant, despite a long history of using Methadone, was able to perform substantial gainful employment for many years. The ALJ also noted that appellant was hospitalized in May of 1979 because of a drug overdose. Although appellant testified to a number of suicide attempts, at the time he was admitted to the hospital, appellant told personnel that he overdosed trying to get high.

Regardless of whether the 1979 hospitalization was the result of a suicide attempt or an accidental overdose, this single incident is not sufficient to show disability due to drug use as required by 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.09. A claimant must show a behavioral or physical change associated with the regular use of substances affecting the central nervous system. Under the McShea/Purter test,[2] a two part evaluation must be made. First, it must be determined whether the claimant is addicted to a substance and has lost the ability to control the abuse. Second, it must be determined whether the addiction renders the claimant unable to perform any gainful activity. The ALJ's decision that appellant was not disabled due to drug abuse was supported by substantial evidence. A single hospitalization in the relevant five year period does not prove the appellant was unable to control his drug use and that he was unable to perform any gainful activity. Appellant maintained his methadone treatment program during this period.

Appellant also claims that the severity of his headaches also renders him disabled. Appellant has been treated for headaches since an auto accident which occurred in 1969 or 1970. Despite the headaches, Matullo was able to work for many years. Appellant alleged that a second auto accident occurred in 1978 which increased the frequency of the headaches. However, there is no documentation that an accident occurred and appellant failed to mention this accident to Drs. DiLallo, Sukhedo, Patrawalla or Harris. Thus, other than his own testimony, appellant provided no substantiation that the headaches worsened. In addition, Dr. D'Aconti reported that Fiorinal provided temporary relief. Based on this evidence, the ALJ concluded that appellant did not suffer such severe pain as to be disabling.

The ALJ's conclusion was supported by substantial evidence. In order for an ALJ to reject a claim of disabling pain, he must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record. *Baerga v. Richardson*, 500 F.2d 309, 312 (3rd Cir. 1974), *cert. denied, Baerga v. Weinberger*, 420 U.S. 931, 95 S.Ct. 1133, 43 L.Ed.2d 403 (1975). A treating physician's report that claimant's headaches respond to Fiorinal as well as lack of credibility as to claimant's allegations that an accident occurred causing his condition to worsen constitutes substantial evidence supporting the ALJ's rejection of appellant's claim of subjective pain. Moreover, Dr. DiLallo's examination of September 1984 concluded that the patient's headaches would not preclude gainful employment at that time.

Appellant also claims that his mental impairment renders him disabled. The ALJ found that appellant's condition deteriorated noticeably around September of 1985, and that his diminished intellectual functioning evident at that time appeared to be the result of deterioration rather than a life long state of mental retardation.

2. This test derives from *Purter v. Heckler*, 771 F.2d 682 (3rd Cir.1985) and *McShea v. Schweiker*, 700 F.2d 117 (3rd Cir.1983).

The ALJ found that prior to September of 1985, it was apparent that there was no evidence of a depressive syndrome or an anxiety related disorder and that he essentially suffered from sociopathic personality disorder reflected in his history of drug abuse. Again, the ALJ's decision is substantially supported by the evidence.

The only evidence relating to appellant's mental condition prior to March of 1983 is Dr. Della Ferra's report. Dr. Della Ferra treated the appellant from 1970 to 1978, during the period appellant was still working. The doctor noted that appellant was emotionally unstable at times, had mental lapses and psychomotor disturbance. Despite these symptoms, appellant worked throughout this period. Nothing in the record shows that appellant's condition worsened prior to March of 1983. In fact, evaluations performed *after* March 31, 1983 concluded that the appellant was able to work.

The first two psychological examinations of the appellant did not find the appellant was disabled. In September of 1984, Dr. Sukhedo found that the appellant had a typical sociopathic personality, but that his ability to relate to others was exceptionally good. The patient appeared very relaxed, there was no sense of suspicion, nervousness, anxiety or fearfulness. Dr. Sukhedo had the impression that the patient's headaches were a way for the patient to receive prescription drugs to make up for his need for more Methadone or heroin. The second evaluation performed by Dr. Patrawalla in January of 1985 found that his intelligence was average, and that he seemed to be trying to "make this interview sick enough to get the benefits." Dr. Patrawalla recommended that he be referred to vocational rehabilitation to be trained for some occupation.

In September of 1985, however, Dr. Friedman evaluated the appellant and found him to be mildly retarded. Appellant showed signs of depression in addition to signs of somatization disorder and of hypocondriasis. He had suicidal ideations, sleep disturbances and a generally dysphoric mood. Subsequent examinations by Dr. Cruz and Dr. Sozzi in 1986 were equally disheartening. They found that no significant improvement could be reasonably anticipated in the foreseeable future.

Thus, the record shows that the appellant became disabled in September of 1985. However, there is no evidence that appellant was unable to work prior to 1983. Despite suffering from imperfect mental health for some time, appellant was able to work for many years. Moreover, an evaluation performed in 1984 concluded that appellant was still able to work. This evidence substantially supports the ALJ's decision that appellant became disabled in September of 1985 and not before.

Appellant also argues that the court erred in ignoring the "new and material" evidence. The first piece of new evidence is Dr. D'Aconti's report. The appellant's claim that this report substantiates a finding of disability is meritless and, in fact, the report provides support for the ALJ's decision. Dr. D'Aconti, the physician who treated appellant monthly from 1979 to 1987, reported that they were unable to determine the origin of the headaches without a neurological work-up and that the only basis of his diagnosis was his clinical complaints and a psychological profile. Thus, the report proved nothing more than what the appellant had already testified to: that he suffered from headaches. Moreover, Dr. D'Aconti stated that Fiorinal provided temporary relief for the appellant's headaches. This hardly constitutes proof that the claimant suffered from pain so great as to be dehabilitating during the relevant period of 1978 through March of 1983.

The other piece of new evidence presented by the appellant was prescription lists from Stadium Pharmacy. Although these lists do indicate extensive use of prescription drugs, the earliest date on which a prescription was written was February 3, 1983. This is one month before March of 1983, the date on which appellant must be found to be disabled to qualify for benefits. Use of prescription drugs for such a short period of time cannot constitute proof of abuse of prescription drugs, even though such abuse may have developed at a later date. The pharmacy lists do not alter the ALJ's conclusion that "the attorney has

produced no medical reports showing that the drugs had been prescribed consistently and in the dosages claimed since at least 1979." Again, the argument that these prescription lists are new and relevant evidence reveals appellant's willingness to attempt to obscure the necessity that he prove his disability existed on or prior to March 31, 1983.

### IV.

In summary, the Secretary's determination to deny appellant disability benefits for the period 1979 to 1985 is supported by substantial evidence. Appellant points to *no* evidence, other than his own testimony, to support a finding of disability. The inconsistencies in appellant's testimony as well as the ALJ's assessment that his testimony was not credible substantially support a finding that appellant was not disabled during the relevant period. Moreover, objective evaluations performed after March 31, 1983 concluded that appellant was capable of working. Any failure of the district court to elaborate upon a finding of its opinion is at most harmless error because the record overwhelmingly supports the Secretary's determination.

Accordingly, the judgment of the district court will be affirmed. Each side to bear its own costs.