Orlean B. BELL, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. CIV.A. 01–282–SLR.

United States District Court,
D. Delaware.

Aug. 22, 2002.

Gary L. Smith, Newark, Delaware, for Plaintiff.

Colm F. Connolly, United States Attorney, and Judith M. Kinney, Assistant United States Attorney, United States Attorney's Office, Wilmington, Delaware, for Defendant, Of Counsel: James A. Winn, Regional Chief Counsel, and Tara A. Czekaj, Assistant Regional Counsel, Social Security Administration, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

### I. INTRODUCTION

Plaintiff Orlean B. Bell filed this action against defendant Jo Anne B. Barnhart, the Commissioner of Social Security ("the Commissioner"), on May 1, 2001. (D.I.1) Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of a decision by the Commissioner denying her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–403. Currently before the court are plaintiff's motion for summary judgment (D.I.11) and defendant's cross-motion for summary judgment (D.I.9). For the reasons that follow, the court shall deny plaintiff's motion and grant defendant's cross-motion.

### II. BACKGROUND

#### A. Procedural History

On June 9, 1995, plaintiff filed applications for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and for supplemental security income based on disability under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.* (D.I. 7 at 28) Plaintiff alleged disability since October 16, 1989 due to back pain, neck pain, and headaches resulting from a motor vehicle accident.[1] (D.I. 7 at 45) The claim for supplemental security income was allowed as of the date of the plaintiff's application, but plaintiff's application for disability insurance benefits (DIB) was denied initially and upon reconsideration. (*Id.* at 31–34, 37–40) Plaintiff requested a hearing before an administrative law judge, and the hear-

---

1. Although neither the parties nor the ALJ have questioned whether an accident occurred, the court notes that none of the medical records from this time period mention a car accident or any other traumatic event. (D.I. 7 at 93–95) Plaintiff has also made inconsistent statements as to whether the alleged accident occurred in 1988 or 1989. (*Id.* at 45, 214) The parties presume it happened in 1989.

ing was held on October 2, 1998. (*Id.* at 43) At the hearing, plaintiff was represented by counsel and a vocational expert testified. (*Id.* at 194–241)

On January 13, 1999 Administrative Law Judge Linda M. Bernstein issued a decision denying plaintiff's disability benefits application. (*Id.* at 12–17) In consideration of the entire record, the ALJ made the following findings:

1. The plaintiff last met the insured status requirements for title II of the Act on June 30, 1993, and therefore had to establish disability on or before that date in order to qualify for title II benefits.

2. Although there was some evidence that the plaintiff worked after the alleged onset date, that work did not constitute a basis for denying the plaintiff's application because the earnings fell below the level which generally establishes the performance of "substantial gainful activity".

3. Prior to July 1, 1993, the plaintiff had the following medically determinable impairments: hiatal hernia, a small ulcer of the distal gastric antrum, and intermittent headaches.

4. The plaintiff's allegations of disabling symptoms and limitations are not credible for the reasons discussed in the ALJ's decision.

5. The plaintiff's impairments did not significantly limit the ability to perform basic work activities during the period under consideration; therefore, the plaintiff did not have a severe impairment.

6. The plaintiff was not under a "disability" as defined in the Social Security Act, at any time through June 30, 1993.

(*Id.* at 12–17).

The decision from the ALJ was appealed to the Appeals Council on March 2, 1999. (*Id.* at 4–5) In denying the request for review, the Appeals Council made the following findings: (1) there was no abuse of discretion; (2) there was no error of law; (3) the ALJ's decision was supported by substantial evidence; (4) there were no policy or procedural issues affecting the general public interest; and (5) there was no new evidence submitted that might have required a re-evaluation of plaintiff's application. (*Id.*) Therefore, the ALJ's January 13, 1999 decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981, 422.210 (2001); *see also Sims v. Apfel,* 530 U.S. 103, 120 S.Ct. 2080, 2083, 147 L.Ed.2d 80 (2000); *Matthews v. Apfel,* 239 F.3d 589, 592 (3d Cir.2001). Plaintiff now seeks review of this decision pursuant to 42 U.S.C. § 405(g).

## B. Facts Evinced at the Administrative Law Hearing

Plaintiff was born on April 14, 1939 and was 59 years of age at the time of the administrative hearing on October 2, 1998 and 54 years of age at the time her insured status for Social Security disability benefits expired. (*Id.* at 199) Plaintiff attended school through the eleventh grade and has no relevant education beyond that. (*Id.* at 202–203)

Plaintiff testified that she last worked in November 1992. (*Id.* at 201) She had worked in a sales position at a retail boutique from March 1991 until November 1992 for three to four hours a day, three times a week, earning $4.50 an hour. (*Id.* at 204) She quit her job at the retail boutique because of back and foot pain and at the urging of her fiancé, who told her he

would take care of her. (*Id.* at 223–225) After her fiancé died in 1993, she had nobody to support her and was living off of her savings. (*Id.* at 224–225)

Her last full time employment was as a house cleaner, a job she held from 1986 until the car accident. (*Id.* at 205) Before that, she worked at Avon from 1978 until 1985 or 1986 in order processing, where she did some moderate lifting and standing. (*Id.* at 206) In the previous 15 years she had also worked as a machine operator and a production laborer. (*Id.* at 207–213)

Plaintiff testified that she had not been able to work at any full time job since she was in a car accident. The accident caused "excruciating" pain in her lower back that radiated down to her left leg. (*Id.* at 213–214) In a questionnaire plaintiff provided to the state Disability Determination Service, plaintiff stated "[m]y physical problem is lower back pains—the pains go into my legs also sometimes leaving my legs feeling as though the blood is not circulating proper. I have numbness in my legs also. Sometimes my back pains are so severe I can't get out of bed." (*Id.* at 57) In addition to the back pain, she also claims to have suffered neck pain and severe headaches as a result of the accident, to the point that she pondered suicide.[2] (*Id.* at 214–215) Plaintiff testified that she got medication from her primary care physician for the headaches, but the medicine did not really help. When asked why she did not see her doctor more regularly about these problems, plaintiff replied that she did not have any insurance or much money. (*Id.* at 217)

Plaintiff also testified that during the 1989 to 1993 time period she suffered from a hiatal hernia, which made her feel nauseated, and she had swelling of her toes. (*Id.* at 216, 218) Plaintiff also alleged she had mental disorders and anxiety problems between 1989 and 1993. (*Id.*)

Plaintiff claimed to have had difficulty walking because of her left leg and could only stand for about half an hour. (*Id.* at 220–221) She also said that because of her back pain she had difficulty with pushing and pulling and reaching for objects. (*Id.* at 222–223)

Plaintiff testified that she typically went to bed very early and engaged in activities such as grocery shopping, watching television, reading, going to church, light cooking, and washing dishes. (*Id.* at 58, 226, 230) Plaintiff was also able to drive during the relevant time period. (*Id.* at 201)

## C. Vocational Evidence

During the hearing, the ALJ called Bruce Martin as a vocational expert. (*Id.* at 231) Mr. Martin opined as to the exertional and skill requirements of plaintiff's prior jobs, and concluded that the most recent job of sales clerk would be light and semi-skilled. (*Id.*) The housecleaning job was classified as being at the light exertional level and unskilled. (*Id.* at 232) The machine operator job was classified as unskilled and light work. (*Id.*) Mr. Martin also alleged all other work to be unskilled and light work. (*Id.*)

## D. Medical Evidence

In November 1988, plaintiff sought medical treatment from her primary care physician, Dr. Biasotto, for complaints of shoulder and arm pain and numbness in the right hand. (*Id.* at 95) The examination revealed a loss of brachioradialis reflex and a positive Tinel's symptom at her wrist. (*Id.*) Plaintiff was diagnosed with carpal tunnel syndrome and an EMG of the right upper extremity was ordered.

2. The court notes plaintiff complained of severe headaches prior to 1988 and in fact claimed to have left the job at Avon in 1985 or 1986 because of headaches. (D.I. 7 at 64)

(*Id.*) Plaintiff did not return to doctor's office until February 1989, when she complained of a left earache, dizziness, tongue numbness, and drooping of the left side of the mouth, which was diagnosed as Bell's Palsy.[3] (*Id.*) Nothing else in the record shows that plaintiff sought or required treatment again for either carpal tunnel syndrome or Bell's Palsy during the relevant period in question.

Plaintiff first sought treatment after the alleged onset date on February 27, 1990. (*Id.* at 94) She again sought treatment with Dr. Biasotto, her primary care physician. (*Id.*) She complained of daily headaches, with pain originating in the neck and traveling up and around the head to the temples. (*Id.*) She reported that she awoke with the headaches and lost her job due to them. (*Id.*) Plaintiff was diagnosed with cephalgia, or headaches, secondary to anxiety and was prescribed Amitriptyline and Axotal. (*Id.*) Dr. Biasotto noted that plaintiff had decreased range of motion of the cervical spine and recommended an x-ray of the cervical spine.[4] (*Id.*) When plaintiff returned on April 9, 1990, she reported having a headache and a stiff neck. (*Id.*) The examination revealed decreased range of motion of the lumbar spine. (*Id.*) Plaintiff was diagnosed with cephalgia again and a neurology consultation was recommended. (*Id.*) An x-ray of the lumbosacral spine performed in April 1990 was within normal limits. (*Id.* at 103)

On May 17, 1990, Dr. Biasotto examined plaintiff for complaints of bilateral ankle edema, edema of the hands, a headache, and lower back pain. (*Id.* at 93) Plaintiff reported that the prescription medication, Fiorinal with Codeine, was helpful. (*Id.*)

When Plaintiff returned in June 1990, she complained of epigastric pain, nausea, and clear vomiting, for which she was taking Tagamet and Dicyclomine. (*Id.*) Plaintiff also complained of pain radiating into her right shoulder. (*Id.*) Dr. Biasotto then prescribed an upper GI, an ultrasound of the gall bladder, and an anti-anxiety medication called Xanax. (*Id.*) The gall bladder was subsequently found to be normal. (*Id.* at 101) The upper GI study revealed a hiatal hernia with no evidence of reflux and no other evidence of abnormality. (*Id.* at 102) At plaintiff's next visit to Dr. Biasotto on August 13, 1990, she complained of chest tightness after eating too much. (*Id.* at 92) Dr. Biasotto diagnosed a hiatal hernia exacerbation and prescribed some medication. (*Id.*) Plaintiff's next visit was on February 1, 1991, when plaintiff complained of a knot on her breast and of feeling drained. (*Id.*) The breast examination was negative and a mammogram and Pap smear were recommended. (*Id.*) The doctor assessed plaintiff as "well." (*Id.*) In a subsequent visit later that year, plaintiff came in for a Pap smear and a pelvic examination and complained of hot flashes. (*Id.*) Plaintiff was supposed to take Premarin but she stopped taking it before the visit. (*Id.*)

An x-ray of the right foot and right ankle in June 1992 revealed no abnormalities except for soft tissue swelling noted in the region of the lateral malleolus. (*Id.* at 100)

Plaintiff's next visit with Dr. Biasotto was on August 24, 1992, when she complained of temporal headaches, eye pressure, and stomach upset caused by Advil.

---

**3.** Bell's Palsy is unilateral facial paralysis of sudden onset and unknown cause. Complete recovery within several months invariably follows acute partial paralysis. *The Merck Manual* 1461 (17th ed.1999).

**4.** Dr. Biasotto's notes from February 27, 1990 indicate a CT scan had been done in the past and a cervical x-ray was recommended, but there is nothing on record about when or where these tests were done, if at all, or what the results were. (*Id.*)

(*Id.* at 91) Plaintiff stated to the doctor that she felt better that day except for generalized weakness. (*Id.*) Dr. Biasotto diagnosed her with cephalgia and recommended blood tests. (*Id.*) Plaintiff visited Dr. Biasotto four days later to discuss her blood test results, which revealed anemia. (*Id.*) Plaintiff also complained of epigastric pain. (*Id.*) Plaintiff was diagnosed with peptic ulcer disease (PUD) with anemia. (*Id.*) An upper GI revealed a small active ulcer of the distal gastric antrum, and the physician recommended a follow-up study in 3–4 weeks. (*Id.* at 99) Plaintiff did not keep her appointment for the following month. (*Id.*)

Plaintiff did not return to Dr. Biasotto again until May 1994, after her insured status had expired. (*Id.* at 90) During that visit, she had complaints related to a tonsilar cyst. (*Id.*) Her next visit with Dr. Biasotto was on July 6, 1995, when she returned for a refill of her estrogen medication. (*Id.*) She stated that she felt good and indicated she only occasionally had problems with her back. (*Id.*)

In October 1995, Dr. I.L. Lifrak, M.D., examined plaintiff at the request of the Disability Determination Service of the Social Security Administration. (*Id.* at 113–20) Plaintiff complained of lower back pain that radiated to both hips and the lower extremities and complained of headaches. (*Id.*) Plaintiff told Dr. Lifrak that she first began experiencing pain in her back and lower extremities in 1987 and began experiencing headaches 40 years before the exam. Plaintiff reported she could walk up to half a block, climb 4–5 steps, sit for periods of up to 30 minutes, and stand for periods of 20–30 minutes. (*Id.*) Plaintiff also stated that she could lift weights of approximately one pound with the right hand and one pound with the left hand. (*Id.*) The physician noted that plaintiff could ambulate without the aid of any assistive device and her gait exhibited a mild degree of limp favoring the right lower extremity. The patient was also able to get on and off the examining table without assistance and was able to perform maneuvers of the hands requiring dexterity. The plaintiff was able to walk on her heels but was unable to walk on her toes. (*Id.*) Dr. Lifrak also noted reduced range of motion in the extremities (D.I. 7 at 116) In a Residual Physical Function Capacity Assessment, Dr. Lifrak found plaintiff could perform work at the medium level of exertion with restrictions from pushing and pulling with the upper extremities and lower extremities. He also found frequent limitations in climbing, balancing, kneeling, crouching, and crawling and occasional limitations in stooping. (*Id.* at 124–130) No other limitations were noted on the evaluation. (*Id.*)

Two other agency physicians concluded in Residual Functional Capacity Assessments that plaintiff could perform a limited range of work at the light exertional level. (*Id.* at 132–39, 141–48)

At the referral of Dr. Biasotto, Dr. Bikash Bose, M.D., saw plaintiff in June 1996 for a neurosurgical consultation. (*Id.* at 159) The evaluation revealed some marked tenderness over the lower lumbar spine and the left sciatic notch. Straight leg raising test was positive on the right side at 45 degrees and on the left side at about 30 degrees. Motor strength of the lower extremities showed weakness of the left glutei and hamstrings. Pin prick sensation was intact in both lower extremities. The doctor also noted that plaintiff was unable to walk on her heels or toes and that clinically the plaintiff had an L–5/S–1 radiculopathy. Dr. Bose noted that an MRI of the lumbar spine showed a large disc herniation at the L–3/4 level and showed hypertrophic degenerative facet disease at L4–5 and L5–S1. (*Id.* at 171) Dr. Bose performed surgery to repair the L–

3/4 disc in July 1996. (*Id.* at 167, 172) After plaintiff's back pain continued, a number of follow-up diagnostic studies in November 1996 revealed a large disc herniation at L–3/4 and also an L–4/5 Grade I spondylolisthesis with significant spinal stenosis at L3–4. (*Id.* at 150)

Dr. Bose again examined plaintiff on February 10, 1997 because of complaints of neck pain. (*Id.* at 149) He noted that plaintiff's cervical range of motion was restricted mildly in all directions, especially lateral rotation to the left. Motor strength in the upper extremities was 5/5, right biceps reflex was absent, and the left biceps reflex was 1/4. Plaintiff had a predominantly right C6 radiculopathy and an MRI showed loss of normal Lordosis with a mild kyphosis and degenerative disc disease at C–6/7 and small right sided disc herniation at C–3/4. Dr. Bose and plaintiff discussed whether to continue with conservative measures or perform surgery. (*Id.*)

On October 3, 1997 Kathleen Keller, an adjudicator for the Disability Determination Service, sent a request to Dr. Michael Borek, M.D., a medical consultant from the Disability Determination Service, for an opinion regarding plaintiff's medical condition prior to June 30, 1993. (*Id.* at 181) She stated on the form request:

> Her date last insured is 6/93. We have only scant records 1988–1994 and, at this point, we are not to develop (e.g., for 1990 c-xray: CT on neuro consult). Based on what we have re: [decreased] ROM C spine and paravertebral muscle spasms, and allegations of pain, I don't think there is sufficient evidence for RFC [less than] sedentary as of 6/93. I don't know that an RFC is possible based on available evidence, even considering subsequent [consultative exam] in 6/95. There are no treating MD/examining MD opinions to consider, just those prior RFC's.

(*Id.* at 181–82) On October 6, 1997, Dr. Borek commented in his evaluation:

> My [impressions]: considering [plaintiff's] pain [symptoms] associated with M.D.I. based as provided MER would be for Sedentary (?) as (54 year old then) best one can determine from rather insufficient MER for this time frame. Actually, I [truly] believe one cannot offer a solid RFC for [date last insured] since *no gait,* no motor testing, etc.; one would need to assume Neuro [negative] means all DTR's, sensory, motor, gait, etc., were fully tested.

(*Id.* at 190)

## III. STANDARD OF REVIEW

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive," and the court will set aside the Commissioner's denial of plaintiff's claim only if it is "unsupported by substantial evidence." 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(E) (1999); *see Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir.1986). As the Supreme Court has held,

> "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established.... It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of

summary judgment pursuant to Fed. R.Civ.P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g),

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)). Where, for example, the countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the Commissioner "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir.1990).

## IV. DISCUSSION

### A. Standards for Determining Disability

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), as amended, "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. § 423(d)(1)(A).

In *Plummer v. Apfel*, 186 F.3d 422 (3d Cir.1999), the Third Circuit outlined the applicable statutory and regulatory process for determining whether a disability exists:

> In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."
>
> The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability. In step one, the Commissioner must determine whether the claimant

is currently engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied. In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work.

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.

*Id.* at 427–8 (internal citations omitted). If the Commissioner finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a).

■ The "severity regulation" applied at step two of the evaluation process states that the claimant must have a severe impairment or combination of impairments which significantly limits claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). Otherwise, claimant does not have a severe impairment and is not disabled. Age, education, and work history are not taken into consideration at this stage. 20 C.F.R. § 404.1520(c). If the impairment is not severe enough so as to limit the claimant's ability to perform most jobs, by definition it does not prevent the claimant from engaging in any substantial gainful activity. *Yuckert*, 482 U.S. at 138, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). "The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Id.* at 153, 107 S.Ct. 2287.

The Commissioner's regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs," including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. *Yuckert*, 482 U.S. at 141, 107 S.Ct. 2287 (citing 20 C.F.R. §§ 404.1521(b), 416(b)).

■ The burden of showing a medically determinable severe impairment or combination of impairments is on the claimant. *Yuckert*, 482 U.S. at 146, n. 5, 107 S.Ct.

2287. This is reasonable because the claimant is in a better position to provide information about his or her own medical condition. *Id.*

## B. Determination of No Severe Impairment

In the case at bar, the issue is whether substantial evidence supports the Commissioner's decision that plaintiff did not have a severe impairment on or before June 30, 1993, the date plaintiff last met the disability insured status requirement. Plaintiff argues that the ALJ failed to fully and fairly develop the medical evidence needed to make a determination and failed to consider medical evidence from the period following plaintiff's date last insured.

At step two of the disability determination process, plaintiff has the burden of demonstrating that she had a severe impairment or combination of impairments at the relevant time. *See Yuckert,* 482 U.S. at 146, n. 5, 107 S.Ct. 2287. After considering plaintiff's testimony and medical records, the ALJ found that plaintiff failed to meet this burden, concluding that plaintiff's impairments "failed to produce more than a minimal effect on the claimant's ability to do basic work activities during the period October 16, 1989 through June 30, 1993." (*Id.* at 15)

While the ALJ acknowledged that plaintiff was found to be disabled as of her application date primarily due to a back impairment, the ALJ found no evidence of ongoing treatment for a back problem un-til after October 1995. (*Id.* at 14) She noted that the primary care physician documented only one complaint of lower back pain prior to 1995 (on May 17, 1990) and an x-ray of the lumbosacral spine conducted in 1990 was normal. (*Id.* at 14) In addition, the ALJ concluded that medical records showed plaintiff's headaches and stomach problems during the relevant time period were "transitory and the treatment records suggest[ed] that they responded well to prescribed medication." (*Id.*) Overall, the ALJ determined that "[t]he objective medical evidence reflected in the exhibit file fails to establish a basis for finding any significant limitation on the claimant's ability to perform basic work activities" during the relevant time period. (*Id.*)

Pursuant to 20 C.F.R. § 404.1529(c)(3) and Social Security Ruling 96–7p, the ALJ also considered other evidence of plaintiff's symptoms that could indicate greater severity of impairment than suggested by objective medical evidence alone.[5] (*Id.* at 15) The ALJ gave greater weight to the primary care physician's records as to the severity of plaintiff's symptoms during the relevant time period than to plaintiff's testimony, because the ALJ found plaintiff's testimony about the severity of her symptoms to be inconsistent with the medical records and because several years had elapsed between the date last insured and the date of plaintiff's testimony. (*Id.*) The ALJ also noted that plaintiff was able to work part time from 1991 to 1992 and,

**5.** Regulation 20 C.F.R. § 404.1529(c)(3) states in part: "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or examining physician or psychologist, or other persons provide about your pain or other symptoms ... is also an important indicator of the intensity and persistence of your symp-toms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or examining physician or psychologist, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account ... in reaching a conclusion as to whether you are disabled ...."

although plaintiff claimed to have quit that job because of headaches, plaintiff also admitted leaving the job at her fiancé's urging. (*Id.*) "This testimony, when considered along with medical records which show no headache complaints around the time she stopped working, suggests that the claimant remained capable of work activity throughout the period covered by this decision." (*Id.*)

Based on the factors outlined above, the ALJ determined that the plaintiff did not have a severe impairment on or before her date last insured and was not disabled for purposes of title II of the Social Security Act. (*Id.* at 15)

Plaintiff argues that the ALJ should have further developed medical evidence about plaintiff's alleged musculoskeletal impairments during the relevant period before making her determination. (D.I. 12 at 10) (citing 20 C.F.R. § 1512(d)). Plaintiff points to Dr. Biasotto's February 1990 note about a CT scan "done in past" and his recommendation for a cervical x-ray that the state Disability Determination Service decided not to investigate further. (*Id.* at 10) Plaintiff argues that this "omission" by the state DDS in turn caused a consulting physician to waver on whether plaintiff's symptoms were due to a medical impairment and what plaintiff's residual function capacity was during that time. (*Id.* at 11) However, plaintiff has never furnished any evidence about when or if the cervical x-ray and CT scan were done, what the results were, or how these records would strengthen or alter the outcome of plaintiff's case. Plaintiff also fails to offer any medical opinion that she was disabled or had any work restrictions imposed by a physician prior to June 30, 1993.

■ Ultimately, the burden to provide evidence of her impairment or its severity remains on plaintiff. The court recognizes that the ALJ has a duty to further develop the record if "the incomplete record reveals evidentiary gaps which result in prejudice to the claimant," *Gauthney v. Shalala,* 890 F.Supp. 401, 410 (E.D.Pa.1995), or where medical records contain a conflict or ambiguity that must be resolved, 20 C.F.R. § 404.1512(e). However, after reviewing the record, the court finds no evidentiary gaps which have resulted in prejudice to the claimant or any conflicts or ambiguities in the medical records that would have prompted the ALJ to seek clarification. The court notes that at the hearing before the ALJ, plaintiff's attorney attributed the lack of objective medical tests during the relevant time period to plaintiff's lack of money. (*Id.* at 239) The attorney did not claim any favorable medical evidence existed that was not part of the record before the ALJ. (*Id.* at 238–240)

Plaintiff also argues the ALJ failed to properly consider medical evidence postdating June 30, 1993. This allegation is not supported by the record, which shows the ALJ considered all of the primary treating physician's records (1988 to 1994) and the extensive medical evidence of plaintiff's back problems after October 1995. (*Id.* at 14) The ALJ explicitly noted that "there are no extensive findings or records of ongoing treatment for this [back] condition until after October 1995," and found the lack of prior ongoing treatment significant to her ultimate determination of no disability. (*Id.*) The court finds the ALJ properly weighed the existing evidence, both medical and non-medical, in making her decision.

■ Based on the above discussion, the court finds that the Commissioner properly applied the rules and regulations governing step two of the disability determination process and had substantial evidence to support her determination that plaintiff did not have a severe impairment or combination of impairments prior to June 30, 1993.

## V. CONCLUSION

Based on the record, the court concludes that the Commissioner had substantial evidence to support the determination that plaintiff was not disabled on or before June 30, 1993 and, therefore, was ineligible for disability insurance benefits. The court grants summary judgment to defendant and denies summary judgment to plaintiff. An order shall issue accordingly.