**Glenn ZACCARIA, Appellant**

v.

**COMMISSIONER OF SOCIAL SECURITY.**

No. 06–4538.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Jan. 7, 2008.

Filed: Feb. 29, 2008.

Abraham S. Alter, Langton & Alter, Rahway, NJ, for Appellant.

Kimberly L. Schiro, Office of United States Attorney Social Security Administration, New York, NY, for Commissioner of Social Security.

Before: FISHER, HARDIMAN and ALDISERT, Circuit Judges.

OPINION OF THE COURT

HARDIMAN, Circuit Judge.

Glenn Zaccaria appeals the District Court's decision affirming the Commissioner's denial of his request for benefits. We will affirm.

I.

As we write exclusively for the parties, who are familiar with the facts and procedural history of the case, we will not repeat them here.

The ALJ found that although Zaccaria suffered from back and shoulder pain, as well as high blood pressure, these impairments were not "severe" at step two of the familiar five-step evaluation process. At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert,* 482 U.S. 137, 140–41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is severe only if it significantly limits the claimant's physical or mental ability to do "basic work activities," *i.e.,* physical "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," or mental activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b). A "severe" impairment is distinguished from "a slight abnormality," which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. *See Bowen,* 482 U.S. at 149–51, 107 S.Ct. 2287.

Here, the ALJ found as follows:

In view of the lack of any medical documentation to establish that [Zaccaria] had any significant functional limitations on or about the date last insured and the fact that he was receiving little or no medical treatment, the evidence in the record does not present any basis for assessing his severity at that time. Accordingly, the evidence is insufficient to establish a severe impairment as of [Zaccaria's] date last insured.

We have stated that "[t]he step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *McCrea v. Commissioner,* 370 F.3d 357, 360 (3d Cir. 2004) (alteration in original) (citations omitted). "Due to this limited function, the Commissioner's determination to deny an applicant's request for benefits at step

two should be reviewed with close scrutiny." *Id.* This does not mean, however, that a reviewing court should apply a more stringent standard of review in these cases. The Commissioner's denial at step two, like one made at any other step in the sequential analysis, is to be upheld if supported by substantial evidence on the record as a whole. Instead, we express only the common-sense position that because step two is to be rarely utilized as basis for the denial of benefits, its invocation is certain to raise a judicial eyebrow.

*Id.* at 360–61 (citations omitted). Our independent review of the record convinces us that Zaccaria's case presented one of those "rare" situations in which a step-two denial was warranted. *See McCrea,* 370 F.3d at 361.

## II.

■ As long as the ALJ's findings of fact—including his assessments of witness credibility—are supported by substantial evidence, they merit deference. *See Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir.1999). Thus, we ask whether the District Court properly found that substantial evidence supported the ALJ's factual determinations. *See Plummer v. Apfel,* 186 F.3d 422, 427 (3d Cir.1999).

To satisfy step two, Zaccaria was required to demonstrate that: (1) by September 30, 1995, he had suffered a severe impairment or combination of impairments which lasted or could be expected to last for twelve months; and (2) his impairment or impairments remained severe at least until one year before he filed his applications. Our review of the record convinces us that the ALJ correctly found that he had shown neither.

In August of 1990, Zaccaria underwent successful back surgery. His pain was gone, he was able to walk the first day after the operation and he was released and advised that he could bear weight as tolerated. His condition improved so much that a February 1991 doctor's note indicated that Zaccaria reported "injur[ing] his right thigh and hip while playing football a few days ago." Occasionally, Zaccaria continued to complain of "some lower back pain" in 1991 and 1992, but these episodes were treated with medication and physical therapy, including weight-training.

In February 1992, Zaccaria saw his doctor for treatment for a dislocated left shoulder, an injury he claimed to have suffered in a late-night altercation. After Zaccaria's shoulder again popped out of joint in March 1992, doctors performed a Bankart surgical procedure to repair it; although his surgeon noted that his "muscularity and size" made the repair difficult, "an excellent repair was achieved. After the operation, doctors reported that Zaccaria was 'doing beautifully' but admonished him not 'to return to the weight room on his own until mid-May.'" Nevertheless, Zaccaria did return to the weight room and began lifting weights once more. Zaccaria complained of shoulder pain once in July 1992, but examination proved the shoulder was stable. He reported no further complications to his left shoulder until December 1995, when he fell on ice and bruised his shoulder.

In April 1992, Zaccaria appeared at the hospital because he had experienced dizziness and anxiety after he "smoked cocaine." Two months later, Zaccaria reappeared in the emergency room reporting the same symptoms; he denied using drugs on that occasion, and—after testing showed "no radiological evidence of cardiac or pulmonary pathology"—he was released with instructions to take medication he had been prescribed for hypertension (which

he admitted discontinuing because he had felt "more normal"). Zaccaria's next neurological complaint was in January 1995, when he appeared in the emergency room complaining of a headache. After a negative CT examination, Zaccaria was discharged a few hours later.

All of the foregoing evidence must be viewed in light of the ALJ's adverse credibility determination in light of Zaccaria's medical treatment and daily activities:

> At the hearing, [Zaccaria] was asked why he waited 11 years to file his application for disability if he was disabled in 1990. He testified that he thought he would improve, but didn't know much about disability, or that he was eligible. At the hearing, [Zaccaria] testified that he was unable to do a light or sedentary job because he could not sit or stand for any period of time, but as noted above, these complaints are completely unsupported by medical evidence as of his date last insured. At the hearing, [he] admitted that he had a vending machine business, but he didn't work at it and didn't make any money. The record is replete with references from [Zaccaria] as to his owning his own businesses throughout the 1990s. With regards to his part-ownership in a business from 1998–2000, he testified that he invested money, did no work, and made no money.

The ALJ specifically noted that "[d]espite [Zaccaria's] many allegations of severe, disabling pain, he has used few medications, relying on over-the-counter medications such as Tylenol."

Zaccaria challenges the ALJ's adverse credibility determination as based on unconfirmed suspicions. To the contrary, we find substantial evidence in the record to support the ALJ's conclusion that Zaccaria was not forthright about his work history during the period in question. Zaccaria's own written submissions to the Commissioner represented that he was working most of the time between May 1992 and November 2001. Although Zaccaria claimed that these were not real jobs (and reported little or no income from them), his request at the hearing that the ALJ distinguish between jobs which were "technically work" and those which were not "on the books"—a request he quickly followed with a denial that he had ever worked off the books—provided sufficient evidence for the ALJ to conclude that Zaccaria was not candid about his level of activity, particularly in light of Zaccaria's claim that he only stopped working because of his impairments in 1997. *See Matullo v. Bowen,* 926 F.2d 240, 247 (3d Cir.1990). Based on this evidence, the ALJ believed that Zaccaria had been working "under the table" after his date last insured: a determination that supported the rejection of his testimony. *See Greger v. Barnhart,* 464 F.3d 968, 972 (9th Cir.2006). Insofar as Zaccaria does not challenge the other bases that the ALJ articulated for finding his testimony less than fully credible—including the fact that his level of activity and his comparatively sparse treatment record were inconsistent with his contention that he suffered from a "severe" impairment during the relevant period—we must accept that determination. *See Reefer v. Barnhart,* 326 F.3d 376, 380 (3d Cir.2003).[1]

In light of the ALJ's finding that Zaccaria's testimony regarding his limitations was not credible, the District Court did not

---

1. Zaccaria argues that the ALJ erroneously found that his 1992 football injury and 1994 crack-smoking were germane to his credibility. We disagree. *See, e.g., Rehder v. Apfel,* 205 F.3d 1056, 1060 (8th Cir.2000); *see also Jernigan v. Sullivan,* 948 F.2d 1070, 1073 (8th Cir.1991).

err when it found that substantial evidence supports the ALJ's determination that, as of September 1995, Zaccaria suffered from no "severe" impairment as defined by the Regulations. Indeed, the medical records show no regular treatment for his alleged shoulder impairment from July 1992 until well after his coverage expired in September 1995. Likewise, the record shows no regular treatment for Zaccaria's alleged back condition after February 1993; like his shoulder, the record reflects that Zaccaria's back-related symptoms recurred long after his coverage lapsed in September 1995, and then only sporadically.[2]

██ Zaccaria insists, however, that because one of his physicians opined that he was disabled as of April 2002, our decision in *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541 (3d Cir.2003), required the ALJ to obtain the testimony of a medical advisor to establish an onset date. We disagree. *Newell* stands for the proposition that the lack of contemporaneous objective medical evidence is not necessarily determinative as to the onset date of an impairment, and that an ALJ errs by requiring such evidence to prove the onset date. *See Newell*, 347 F.3d at 547. But *Newell* did not absolve the claimant of the burden to establish a severe impairment at step two. *See Bowen*, 482 U.S. at 146 n. 5, 107 S.Ct. 2287. Here, substantial evidence supports the ALJ's finding that Zaccaria's sporadic treatment after his shoulder surgery in 1992 belied his claim that he suffered from a severe impairment. Absent either contemporaneous medical records or credible lay testimony corroborative of Zaccaria's claims *as of September 1995,* the ALJ was not required to call a medical expert to testify as to the onset date of an impairment identified for the first time by a

doctor in *April 2002.* The Regulations support this conclusion. *See* 20 C.F.R. § 404.1527(f)(2)(iii).

## III.

For all of the foregoing reasons, the judgment of the District Court will be affirmed.

---

2. The chiropractic records that Zaccaria submitted after the hearing support this conclusion. Zaccaria received routine chiropractic spinal adjustments from late October 1992 until early March 1993, but received only four adjustments in the next 4½ years.