**John MACERA, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. CIV.A. 02–1473–JJF.**

United States District Court, D. Delaware.

Feb. 20, 2004.

Gary C. Linarducci, Esquire of Gary C. Linarducci, New Castle, DE, for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney, and Patricia C. Hannigan, Esquire, Assistant United States Attorney, of the Office of the United States Attorney, Wilmington, DE Of Counsel: James A. Winn, Esquire, Regional Chief Counsel, and Margaret J. Krecke, Esquire, Assistant Regional Counsel of the Social Security Administration, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court is an appeal pursuant to 42 U.S.C. § 405(g), filed by Plaintiff, John L. Macera, seeking review of the final decision of the Commissioner of the Social Security Administration denying Plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Plaintiff has filed a Motion For Summary Judgment (D.I.8) requesting the Court to enter judgment in Plaintiff's favor or in the alternative to remand this matter to the A.L.J. In response to Plaintiff's Motion, Defendant has filed a Cross–Motion For Summary Judgment (D.I.10) requesting the Court to affirm the Commissioner's decision. For the reasons set forth below, Defendant's Motion For Summary Judgment will be granted and Plaintiff's Motion For Summary Judgment will be denied. The decision of the Commissioner dated August 12, 1999 will be affirmed.

## BACKGROUND

### I. Procedural Background

Plaintiff has filed a total of three applications for disability insurance benefits ("DIB"). Plaintiff's first application was filed on May 5, 1989, alleging disability beginning December 31, 1988. This application was denied initially and upon reconsideration, and further action with respect to this application was not taken.

Plaintiff's second application was filed on December 17, 1991, alleging disability beginning March 7, 1990. This application was denied initially and upon reconsideration and a hearing was requested. Following the hearing, the A.L.J. denied the application, and the United States District Court for the Eastern District of Pennsylvania affirmed the A.L.J.'s decision.

Plaintiff's third application, which was filed on March 10, 1998, is the subject of this appeal. By his application Plaintiff alleged that he was disabled since August 20, 1988, because of high blood pressure, angina, atrial fibrillation, diabetes, knee problems, arthritis, a herniated disc in his neck, carpal tunnel syndrome, a hernia, and a hearing problem. (Tr. 101–104, 126). Plaintiff concedes that *res judicata* applies by virtue of his previously filed applications to the periods from December

31, 1988 through February 21, 1990 and March 7, 1990 through May 3, 1993. For purposes of the instant application, Plaintiff acknowledges that he must show that he became disabled prior to December 31, 1995, the date on which his insured status expired (Tr. 132). Plaintiff contends that he is entitled to disability benefits beginning on May 4, 1993.

With respect to the administrative process, Plaintiff's application was denied initially and upon reconsideration. (Tr. 83–87, 90–93). Plaintiff filed a timely request for a hearing, and the A.L.J. held a hearing on February 22, 1999. (Tr. 33–80). Plaintiff was represented by counsel at the hearing and both he and his wife testified. Following the hearing, the A.L.J. issued a decision on August 12, 1999, denying Plaintiff's claim. (Tr. 15–27). Plaintiff filed an appeal, and the Appeal's Council denied review. (Tr. 8–9). Accordingly, the A.L.J.'s decision became the final decision of the Commissioner. *Sims v. Apfel,* 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000).

After completing the process of administrative review, Plaintiff filed the instant civil action pursuant to 42 U.S.C. § 405(g), seeking review of the A.L.J.'s decision denying his claim for DIB. In response to the Complaint, Defendant filed an Answer (D.I.5) and the Transcript (D.I.6) of the proceedings at the administrative level.

Thereafter, Plaintiff filed a Motion For Summary Judgment and Opening Brief (D.I.9) in support of the Motion. In response, Defendant filed a Cross–Motion For Summary Judgment and a combined Opening and Answering Brief (D.I.11) requesting the Court to affirm the A.L.J.'s decision. Thereafter, Plaintiff filed a Reply Brief (D.I.12) to Defendant's Cross–

Motion For Summary Judgment. Accordingly, this matter is fully briefed and ripe for the Court's review.

## II. Factual Background

### A. Plaintiff's Medical History, Condition and Treatment

As of the date he was last insured, Plaintiff was forty-four years old. Plaintiff has a high school education and became a registered plumber. (Tr. 42, 131). During his apprenticeship, Plaintiff was electrocuted, and Plaintiff speculates that the electrocution resulted in his affliction with atrial fibrillation, although doctors have indicated to Plaintiff that they are unsure of its cause. (Tr. 21, 60).

■ Between November 1973 and August 1988, Plaintiff worked as foreman of a utility group, which maintained the hearing, air-conditioning and power systems at City Hall in Philadelphia. (Tr. 131). Plaintiff's work was heavy because he had to install pumps and pipes. (Tr. 43). Plaintiff stopped working for the city in August 1988, when he was 37 years old. Plaintiff receives a city disability pension of $271.14 per week ($14,099 year).[1] (Tr. 100, 44).

### 1. Plaintiff's Heart Condition

Plaintiff's primary care physician during the relevant time frame was John R. Walsh, D.O. Plaintiff was diagnosed with atrial fibrillation, and Plaintiff often complained to his physician of palpitations, rapid heart beat or chest pain. However, when Dr. Walsh examined Plaintiff after these episodes, he often noted normal heart sounds. (Tr. 201, 200, 193, 195, 185, 186, 181, 174, 172). Dr. Walsh also noted

---

1. The city's determination that Plaintiff was entitled to a disability pension is not determinative for purposes of the Commissioner's decision. 20 C.F.R. § 404.1504; *Coria v. Heckler,* 750 F.2d 245, 247 (3d Cir.1984).

on several occasions that Plaintiff's atrial fibrillation was stable. (Tr. 191, 187, 176). Although there were occasional highs and lows, Dr. Walsh's progress notes indicate that Plaintiff's blood pressure was primarily within the normal range of about 130/80 with medication. During this time, Plaintiff was 5'8" tall and weighed between 220 and 230 pounds.

Dr. Walsh referred Plaintiff to Jack Garden, M.D., F.A.C.C., a cardiologist, who treated Plaintiff for intermittent atrial fibrillation between November 1994 and January 1996. Plaintiff first presented to Dr. Garden in November 1994 with complaints of palpitations during the night. Dr. Garden noted that a cardiac catheterization and a thallium exercise stress test were normal. (Tr. 401, 492–495). Plaintiff's blood pressure was 140/100 and his heart was in normal sinus rhythm. (Tr. 402). An electrocardiogram showed atrial fibrillation and an echocardiogram showed left ventricular hypertrophy (LVH) with normal wall motion, top normal left atrium and right heart dimensions. (Tr. 402). Dr. Garden recommended that Plaintiff avoid alcohol and caffeine, lose weight and add Lopressor to his medication regimen. (Tr. 402).

In January 1995, Plaintiff reported to Dr. Garden that he was feeling much better and had palpitations less than once a week lasting for about a minute at a time. (Tr. 335). Plaintiff's blood pressure was 140/100, and his cardiac exam was unchanged. (Tr. 335). Dr. Garden prescribed one aspirin a day and increased his dosage of Lopressor. Dr. Garden also reiterated his recommendations for weight loss and dietary restrictions.

In February 1995, Dr. Garden noted that Plaintiff was "looking and feeling extraordinary well." (Tr. 334). Plaintiff had no cardiac symptoms and had been "quite active including a very much enjoyed trip to Las Vegas last month." (Tr. 334). Plaintiff lost 3 pounds, and his blood pressure was 130/80. Plaintiff's cardiopulmonary examination was "unremarkable," and an EKG showed sinus bradycardia. (Tr. 334). Dr. Garden indicated that he was "very pleased with how he is doing." (Tr. 334). Plaintiff's heart rate was 50, and there was no evidence of hemodynamic or symptomatic compromise. Dr. Garden again advised Plaintiff to control his diet and weight, so that his medications could be tapered back. (Tr. 334).

At his March 1995 visit with Dr. Garden, Plaintiff indicated that he had palpitations two weeks earlier, but that his symptoms abated with an increase in his Lopressor. Plaintiff's blood pressure was 140/90 and his cardiac examination was "unremarkable." (Tr. 333).

In July 1995, Dr. Garden noted that Plaintiff was looking and feeling well and that he was almost completely asymptomatic with no palpitations, chest pain, shortness of breath or light headedness. (Tr. 330). Plaintiff lost 9 pounds, and his blood pressure was 100/60. Dr. Garden indicated that he was "delighted with how John was doing" and decreased his dose of Lopressor in light of his lower blood pressure and asymptomatic status. (Tr. 330).

On January 17, 1996, Plaintiff told Dr. Garden that he had episodes of palpitations at Christmas time when he had not been taking his Lopressor. (Tr. 331). Plaintiff gained 12 pounds and his blood pressure was 140/86 in the right arm and 140/94 in the left arm. (Tr. 331). Plaintiff's cardiac examination remained unremarkable and his EKG showed normal sinus rhythm. Dr. Garden noted his belief that Plaintiff's symptoms suggested an "ischemic trigger" and he set up an exercise echocardiogram. (Tr. 331–332). Plaintiff's February 12, 1996 echocardiogram exercise stress test showed good exercise

tolerance, normal heart wall motion on exercise and rest and no ischemic changes, ruling out an "ischemic trigger." (Tr. 506). Plaintiff exercised to 12.9 METS.[2] (Tr. 506). Dr. Garden continued to stress that it was urgent for Plaintiff to be compliant with his medications and to control his diet. (Tr. 332).

In June 1996, six months after the expiration of his insured status, Plaintiff was hospitalized at Methodist Hospital for two days with complaints of angina and atrial fibrillation. (Tr. 397–398). Normal cardiac enzymes ruled out a heart attack and an echocardiogram was within normal limits. (Tr. 398, 399). A thallium exercise stress test indicated some inferior wall abnormalities, so Plaintiff was transferred to Jefferson Hospital for cardiac catheterization. (Tr. 398). The results of the cardiac catheterization were normal and showed normal heart wall motion, no narrowing (stenoses) of the coronary arteries, normal left ventricular function and an ejection fraction of 75%. (Tr. 497).

In April 1998, more than two years after Plaintiff's insured status expired, Plaintiff underwent another exercise stress test. The results of this test showed normal blood pressure and no arrhythmia, and Plaintiff exercised to 19.2 METS. (Tr. 412).

### 2. Plaintiff's Knee Condition

During the relevant time frame, Plaintiff also presented to Dr. Walsh with right knee pain on several occasions (Tr. 196, 187, 174, 173), especially when he was driving a lot. (Tr. 177). Physical therapy alleviated some of Plaintiff's pain (Tr. 185), and Dr. Walsh referred Plaintiff to Dr.

Joseph Shatouhy, an orthopedist. In December 1995, Dr. Shatouhy noted swelling in the popliteal space associated with tenderness over the lateral joint line, but no apparent instability of the collateral ligament. (Tr. 317). Dr. Shatouhy ordered x-rays, which showed degenerative changes with some narrowing of the medial joint space (Tr. 264). An MRI of Plaintiff's knee showed degenerative changes and a horizontal tear of the medial meniscus with no ligament or tendon laxity. (Tr. 265).

In February 1995, Dr. Shatouhy discerned no palpable effusion in the right knee, but noted some tenderness. Dr. Shatouhy advised Plaintiff that he could postpone arthroscopy to correct the meniscal tear for as long as he could tolerate any pain he was experiencing. (Tr. 317). Plaintiff eventually had knee surgery in 1998.

### 3. Plaintiff's diabetes .

Plaintiff was also diagnosed with diabetes mellitus. Dr. Walsh prescribed oral medications to treat this condition. (Tr. 171–201). Plaintiff's blood glucose levels were elevated during the relevant time frame, but insulin therapy was not prescribed. (Tr. 51). Dr. Walsh referred Plaintiff to Dr. Albert Maguire, an opthalmologist, who treated Plaintiff for nonproliferative diabetic retinopathy between March 1995 and November 1996. (Tr. 338–343). In March 1995, Dr. Maguire noted an area of macular edema in the left eye. (Tr. 344). By April 1995, Plaintiff underwent successful and uncomplicated laser treatment on the left eye. By June 1995, Plaintiff's macular swelling resolved

---

**2.** The ability to exercise to 10 METS is considered to be consistent with the capacity to perform activities like shoveling 16 pound loads for 10 minutes at a time, running at a pace of 6 miles per hour, ski touring at 5 or more miles per hour in loose snow and playing competitive squash and handball. American Heart Association, *Exercise Testing and Training of Individuals with Heart Disease or at High Risk for Its Development: A Handbook for Physicians* (1975).

and he had no progressive retinopathy. (Tr. 342). Plaintiff had no recurrence of macular edema. Dr. Walsh indicated that Plaintiff's vision was 20/15 in the left eye with glasses. (Tr. 188). Despite these problems, Plaintiff has indicated that he has never had any vision problems. (Tr. 52, 65).

#### 4. Plaintiff's Hearing Loss

In 1991, Dr. Walsh referred Plaintiff to Dr. Bruce Romanczuk, an otolaryngologist, for complaints of hearing loss. (Tr. 466–468). Plaintiff underwent an audiogram which showed moderate lower frequency hearing loss and sever high frequency hearing loss. (Tr. 468). In June 1994, Plaintiff presented to Dr. Romanczuk with complaints of occasional tinnitus. Dr. Romanczuk noted normal ear canals, tympanic membranes and tuning fork testing. Dr. Romanczuk diagnosed Plaintiff with high frequency sensorineural hearing loss (Tr. 466), but Plaintiff's speech discrimination was 100%. (Tr. 478).

#### 5. Plaintiff's Other Ailments

Between May 1993 and December 31, 1995, Plaintiff reported to Dr. Walsh with various isolated complaints. Plaintiff complained to Dr. Walsh of a headache on January 5, 1994 (Tr. 194), left calf swelling on March 10, 1994 (Tr. 192), low back pain on January 3, 1995 (Tr. 184), and neck pain on August 30, 1994 and October 6, 1995 (Tr. 190, 175).

#### 6. Medical Opinions in the Record

On April 4, 1995, Dr. Walsh wrote a letter addressed "To Whom It May Concern." In that letter, Dr. Walsh opined that Plaintiff was disabled due to diabetes mellitus with neuropathy and retinopathy and atrial fibrillation with recurrent chest pain. (Tr. 510).

In May and June 1998, two state agency physicians reviewed Plaintiff's medical records for the period between May 4, 1993 and December 31, 1995. Both physicians concluded that Plaintiff was able to perform light work. (Tr. 378–385, 387–394).

On February 18, 1999, three years after Plaintiff's insured status expired, Dr. Garden wrote a note at the request of Plaintiff's counsel that Plaintiff had cardiac conduction system disease which was manifested by cardiac arrhythmia or irregular heart rhythms that required intensive medication for therapy. (Tr. 502). Dr. Garden also opined that Plaintiff might need a pace maker in the near future. On March 1, 1999, Dr. Walsh also wrote a note at the request of counsel stating that Plaintiff had been disabled during the period of 1993 through 1995. (Tr. 509).

On February 15, 1999, Drs. Walsh and Gardener signed identical functional capacity assessment forms. In these forms, the doctors indicated that Plaintiff could only sit for one hour due to knee pain, could never stand and walk and could not lift or carry anything in an eight-hour workday. (475–476, 477–478).

#### B. *The A.L.J.'s Decision*

On February 22, 1999, the A.L.J. conducted a hearing on Plaintiff's application for benefits. At the hearing, Plaintiff was represented by counsel. Plaintiff and his wife testified at the hearing about his condition between May 4, 1993 and December 31, 1995. Although Plaintiff had difficulty remembering this time frame, he testified that he thought he had knee pain once a month (Tr. 46), palpitations every day for 10–60 minutes (Tr. 50), and headaches once a week for a day or so (Tr. 54). Plaintiff also testified that he spent a lot of time in bed (Tr. 55) and that he had terrible stiff necks lasting for days (Tr. 56), tingling and numbness in his hands on

awakening that lasted for 30 minutes. Plaintiff also testified that his blood pressure was controlled, but that he had hearing problems since 1990, felt dizzy once or twice a week for 15–20 minutes (Tr. 61) and had neck and low back pain that limited his ability to sit. (Tr. 72).

Plaintiff's wife indicated that she could not testify regarding her husband's activities during the week, because she worked full time. However, she testified that his activities were limited on the weekends. (Tr. 78). Plaintiff's wife also testified that Plaintiff had several migraines that kept him in bed all day (Tr. 75–76) and that he did not help her much because of his fibrillation attacks and knee pain. (Tr. 77).

In her decision dated August 12, 1999, the A.L.J. concluded that on the date his insured status expired, December 31, 1995, the medical evidence for the time frame between May 4, 1993 to December 31, 1995 established that Plaintiff had severe knee and cardiac impairments, as well as non-severe diabetes, hypertension, hearing, neck and visual impairments, but that he did not have an impairment or combination of impairments listed in or equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The A.L.J. also concluded that during this time period, Plaintiff retained the residual functional capacity to perform the full range of sedentary work. Applying the Medical Vocational Guidelines in light of Plaintiff's condition, his residual functional capacity, age, education and work experience, the A.L.J. concluded that Plaintiff was not disabled as of the date his insured status expired.

## STANDARD OF REVIEW

■ Pursuant to 42 U.S.C. § 405(g), findings of fact made by the Commissioner of Social Security are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Com-missioner's decision is limited to determining whether "substantial evidence" supports the decision. *Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *Id.* In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. *Id.* at 1190–91.

■ The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 555, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

■ With regard to the Supreme Court's definition of "substantial evidence," the Court of Appeals for the Third Circuit has further instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence ... or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983). Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. *Id.; Smith v. Califano*, 637 F.2d 968, 970 (3d Cir.1981).

## DISCUSSION

### I. Evaluation Of Disability Claims

Within the meaning of social security law, a "disability" is defined as the inabili-

ty to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." 20 C.F.R. § 404.1505. In order to qualify for disability insurance benefits, the claimant must establish that he or she was disabled prior to the date he or she was last insured. 20 C.F.R. §§ 404.131, *Matullo v. Bowen,* 926 F.2d 240, 244 (3d Cir.1990). The claimant bears the initial burden of proving disability. 42 U.S.C. § 423(d)(5).

In determining whether a person is disabled, the Regulations require the A.L.J. to perform a sequential five-step analysis. 20 C.F.R. § 404.1520. In step one, the A.L.J. must determine whether the claimant is currently engaged in substantial gainful activity. In step two, the A.L.J. must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that his or her impairment is severe, he or she is ineligible for benefits. *Plummer v. Apfel,* 186 F.3d 422, 427 (3d Cir.1999).

If the claimant's impairment is severe, the A.L.J. proceeds to step three. In step three, the A.L.J. must compare the medical evidence of the claimant's impairment with a list of impairments presumed severe enough to preclude any substantial gainful work. *Id.* at 428. If the claimant's impairment meets or equals a listed impairment, the claimant is considered disabled. If the claimant's impairment does not meet or equal a listed impairment, the A.L.J.'s analysis proceeds to steps four and five. *Id.*

In step four, the A.L.J. is required to consider whether the claimant retains the residual functional capacity to perform his or her past relevant work. *Id.* The claimant bears the burden of establishing that he or she cannot return to his or her past relevant work. *Id.*

In step five, the A.L.J. must consider whether the claimant is capable of performing any other available work in the national economy. At this stage the burden of production shifts to the Commissioner, who must show that the claimant is capable of performing other work if the claimant's disability claim is to be denied. *Id.* Specifically, the A.L.J. must find that there are other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's medical impairments, age, education, past work experience and residual functional capacity. *Id.* In making this determination, the A.L.J. must analyze the cumulative effect of all of the claimant's impairments. At this step, the A.L.J. often seeks the assistance of a vocational expert. *Id.* at 428.

## II. Whether The A.L.J.'s Decision Is Supported By Substantial Evidence

By his Motion, Plaintiff contends that the A.L.J.'s decision is erroneous for two reasons. First, Plaintiff contends that the A.L.J. improperly rejected the opinions of Plaintiff's treating physicians. Second, Plaintiff contends that the A.L.J. improperly relied solely upon the Medical–Vocational Guidelines to conclude that Plaintiff was not disabled. The Court will consider each of Plaintiff's arguments in turn.

### A. Whether The A.L.J. Erred In Rejecting The Opinions Of Plaintiff's Treating Physicians

■ The opinion of a treating physician is entitled to controlling weight when it is

supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other evidence in the record. *Russum v. Massanari,* 2002 WL 775240, *5 (D.Del. April 12, 2002); 20 C.F.R. § 404.1527(d)(2). However, the A.L.J. may reject such an opinion, if he or she adequately explains the reasons for doing so on the record. *Id.*

In this case, each of Plaintiff's treating physicians, Dr. Walsh and Dr. Garden, completed a residual functional capacity assessment for Plaintiff at the request of counsel, one week before Plaintiff's hearing and three years after Plaintiff's disability insured status expired. These assessments were substantively identical in their conclusions and do not indicate that they pertain to the time period at issue in this case, i.e. May 4, 1993 to December 31, 1995.

In her opinion, the A.L.J. considered these opinions, but concluded that they were not supported by the medical evidence in the record and were inconsistent with the contemporaneous treatment notes of both physicians. For example, Dr. Garden was Plaintiff's cardiologist and he never treated Plaintiff for his knee complaints, yet Dr. Garden opined that Plaintiff's limitations were attributable to his knee pain. Further, the record indicates that while Plaintiff had some knee pain, his condition was not very severe or frequent and did not necessitate surgery until 1998. As for Plaintiff's atrial fibrillation, neither Dr. Garden or Dr. Walsh attributed any of Plaintiff's limitations to this condition, and the contemporaneous treatment notes of both physicians during the relevant time indicate that Plaintiff's condition had improved and was controlled well with medication, that his cardiac exams were normal and that he presented infrequently with complaints related to his heart problem. Further, with respect to such "check the box" or "fill in the blank" forms, the Third Circuit has specifically recognized that such assessments are considered "weak evidence at best," particularly where, as here, they are unaccompanied by a thorough written report and are retrospective opinions which are unsupported by evidence of actual disability during the relevant time frame. *Mason v. Shalala,* 994 F.2d 1058, 1065 (3d Cir.1993); *Potter v. Secretary of HHS,* 905 F.2d 1346, 1348–1349 (10th Cir.1990) (recognizing that treating physician may give retrospective diagnosis, but stressing that evidence of actual disability prior to expiration of insured status is required, particularly where disease is progressive).

As for the 1995 opinion of Dr. Walsh that Plaintiff was disabled, the A.L.J. also considered this opinion, but concluded that it was not supported by the record. In his letter, Dr. Walsh opined that Plaintiff was disabled because of diabetes mellitus with neuropathy and retinopathy and by atrial fibrillation with recurrent chest pain. As explained above, the progress notes of Dr. Walsh indicated that Plaintiff had few complaints relevant to his atrial fibrillation during the relevant time period. In addition, there is no evidence in the record that Plaintiff had disabling diabetic neuropathy. Rather, the record indicates that by April 1995, Plaintiff's treating opthalmologist reported that Plaintiff had successful laser treatment for non-proliferative diabetic retinopathy with resolution of macular swelling. (Tr. 343). Plaintiff's opthalmologist also reported that Plaintiff had no complications as a result of the treatment, and there is no record evidence of any recurrence. (Tr. 341–338). Further, Plaintiff testified at the hearing that even though he was diagnosed with diabetic retinopathy, he never had any vision problems and that his condition was something that was discovered by the doctors as a result of a routine eye examination.

 It is well-established that a physician's conclusory statements that a claimant is "disabled" or "unable to work" are not binding on the Commissioner, and the Commissioner is not required to give special significance to the source of such an opinion. 20 C.F.R. § 404.1527(e)(1), (3). Further, a physician's diagnosis of an impairment is not sufficient to establish disability unless the impairment is accompanied by functional limitations that preclude working. *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir.1990). In his 1995 opinion, Dr. Walsh never identified any functional limitations that would preclude Plaintiff from working, and as discussed above, the record contained no such limitations.

In sum, the A.L.J. thoroughly considered the opinions of Dr. Walsh and Dr. Garden in light of the record evidence and properly concluded that these opinions were not entitled to significant weight. The A.L.J. adequately explained her reasons for rejecting these opinions, and the Court concludes that the findings of the A.L.J. are supported by substantial evidence. Accordingly, the Court concludes that the A.L.J. did not err in her assessment of the opinions of Plaintiff's treating physicians.

B. *Whether The A.L.J. Erred In Applying The Medical Vocational Guidelines To Plaintiff's Claim*

 The Medical Vocational Guidelines or "Grids" may be used at step five of the sequential analysis to determine whether a claimant can perform other work. *See Jesurum v. Sec'y of Health & Human Services*, 48 F.3d 114, 117 (3d Cir.1995)

(citing *Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983)). In applying the Grids, the A.L.J. is required to take into consideration the claimant's age, educational level, previous work experience, and residual functional capacity. *See* 20 C.F.R. § 404, subpt. P, app. 2 (1999). If the claimant suffers from significant non-exertional limitations, such as pain or psychological difficulties, the A.L.J. must determine, based on the evidence in the record, whether these non-exertional limitations further limit the claimant's ability to work. *See* 20 C.F.R. § 404.1569a(c)-(d). If they do not, the A.L.J. may properly rely on the Grids. If, however, the claimant's non-exertional limitations are substantial, the A.L.J. may only use the Grids as a "framework," and the testimony of a vocational expert is ordinarily used to determine if the claimant can work. *See* 20 C.F.R. § 404, subpt. P, app. 2, § 200(d)-(e); *Santise v. Schweiker*, 676 F.2d 925, 935 (3d Cir.1982).

 Reviewing the A.L.J.'s decision in light of the applicable law, the Court concludes that the A.L.J. did not err in applying the Grids to Plaintiff's claim. Plaintiff contends that the A.L.J. failed to take into account his atrial fibrillation when she applied the Grids, but Plaintiff's contention is belied by the opinion of the A.L.J. It is apparent that the A.L.J. thoroughly considered the evidence related to Plaintiff's heart condition, as well as Plaintiff's other physical conditions, and concluded that there was no evidence in the record of substantial non-exertional limitations which would preclude Plaintiff from performing the requirements of sedentary work during the relevant time frame.[3]

---

**3.** Sedentary work requires a claimant to be able to sit, lift no more than 10 pounds at a time and occasionally lift or carry articles like docket files, ledgers and small tools. Sedentary work also requires an occasional amount of standing or walking, which would amount to no more than two hours in an eight hour work day. 20 C.F.R. § 404.1567(a); Social Security Ruling 96–9p.

Based on the record, the Court agrees with the A.L.J.'s analysis and concludes that it is supported by the record evidence, which shows that while Plaintiff suffered some instances of palpitations in the period between May 1993 and December 31, 1995, Plaintiff's atrial fibrillation was in large part successfully controlled with medication. Progress notes from Plaintiff's treating physicians during this time frame indicate that Plaintiff was feeling better and doing extraordinarily well, and the results of Plaintiff's cardiac tests and examinations were unremarkable. As the Third Circuit and other courts have recognized, conditions which can be reasonable controlled by medication or treatment are not considered disabling. 20 C.F.R. § 404.1530, *see e.g. Warford v. Bowen,* 875 F.2d 671, 673 (8th Cir.1989); *Brown v. Bowen,* 845 F.2d 1211, 1215 (3d Cir.1988); *Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir.1987). Further, as to Plaintiff's knee pain and other ailments, the record suggests that Plaintiff's pain was not so severe as to restrict his ability to perform sedentary work. Indeed, the record suggests that Plaintiff delayed knee surgery for several years, and Plaintiff's other complaints were infrequent during the relevant time frame.

In addition, Plaintiff contends that the A.L.J. should have taken the testimony of a vocational expert because Plaintiff suffered from the nonexertional limitation of being unable to tolerate stress as a result of his atrial fibrillation. In support of his contention, Plaintiff directs the Court to the Disability Handbook for the proposition that "patients who suffer from atrial fibrillation poorly tolerate stress." (D.I.

12 at 6). However, the section of the Disability Handbook from which Plaintiff quotes reads slightly different. In pertinent part, the Disability Handbook provides:

> With abnormal rhythms, the heart tends to lose its capacity to accommodate the requirements of physical exertion. In general the lower the level of the cardiac pacemaker, the slower is the cardiac rate and the worse the symptoms with the exertion.

> These considerations explain the fact that *exertional stress is poorly tolerated by patients with acute or chronic abnormalities of cardiac rhythm.*

Alan Balsam & Albert P. Zabin, *Disability Handbook* § 3.22 (1st ed.1990) (emphasis added). Based on this text, it is evident that the "stress" which is discussed in the passage referred to by Plaintiff is "exertional stress" and not the type of nonexertional limitation that would preclude reliance on the Grids.[4] Further, the Court has not located and Plaintiff has not pointed out any record evidence suggesting that Plaintiff had difficulty tolerating the type of stress that would be considered a nonexertional limitation. Accordingly, the record supports the A.L.J.'s finding that Plaintiff did not suffer from any substantial or severe non-exertional limitations. Because Plaintiff did not suffer from any non-exertional limitations that would place additional restrictions on Plaintiff's ability to work, the Court concludes that the A.L.J. was not required to take the testimony of a vocational expert and that the A.L.J. appropriately applied the Grids to find that Plaintiff was not disabled. *San-*

---

**4.** The Table of Cardiac Arrhythmias in the *Disability Handbook* does suggest that stress may be a precipitant for atrial fibrillation, but it does not suggest as Plaintiff contends that all individuals with atrial fibrillation poorly handle non-exertional stress. Balsam & Za-

bin, *supra* at § 3.22 at 128. As the Court has pointed out and the A.L.J. correctly found, the record does not support that Plaintiff was afflicted with any susbstantial, non-exertional limitations during the relevant time frame.

*tise,* 676 F.2d at 928, 935 (holding that "[i]f an individual's medical vocational status in fact is described by the grid, the regulations require that a particular decision be reached" and further recognizing that the A.L.J. may take "administrative notice of the general availability of jobs, as opposed to reliance on the identification of tasks by a vocational expert").

### C. *Summary*

In sum, the Court concludes that the A.L.J. did not err in her treatment of Plaintiff's treating physician opinions or in her application of the Grids to direct a finding of "not disabled." As discussed in the context of Plaintiff's legal arguments, the A.L.J.'s findings are supported by substantial evidence from the record. Further, the Court is not unsympathetic to Plaintiff and recognizes that there is evidence in the record indicating that Plaintiff's condition may have worsened in recent years; however, the Court is constrained to consider only the evidence stemming from the narrow time frame at issue in this case. *Matullo,* 926 F.2d at 244. Because the A.L.J. did not err in her assessment of that evidence, the Court will affirm her decision. Accordingly, the Court will grant Defendant's Motion For Summary Judgment and deny Plaintiff's Motion For Summary Judgment.

### CONCLUSION

For the reasons discussed, Defendant's Motion For Summary Judgment will be granted, and Plaintiff's Motion For Summary Judgment will be denied. The decision of the Commissioner dated August 12, 1999 will be affirmed.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this 20th day of February 2004, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendant's Cross–Motion For Summary Judgment (D.I.10) is GRANTED.

2. Plaintiff's Motion For Summary Judgment (D.I.8) is DENIED.

3. The final decision of the Commissioner dated August 12, 1999 is AFFIRMED.

### JUDGMENT IN A CIVIL CASE

For the reasons set forth in the Court's Memorandum Opinion and Order dated February 20, 2004;

IT IS ORDER AND ADJUDGED that judgment be and is hereby entered in favor of Defendant Jo Anne B. Barnhart and against Plaintiff John Macera.