**Deborah E. Cannon BOROWKA,**
**Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner,**
**Social Security Administration,**
**Defendant.**

No. CIV. 04–239–SLR.

United States District Court,
D. Delaware.

Aug. 5, 2005.

David J. Lyons, Esquire of The Lyons Law Firm, Wilmington, DE, for Plaintiff.

Colm F. Connolly, United States Attorney and David F. Chermol, Special Assistant United States Attorney, United States Attorney's Office, Wilmington, DE, for Defendant. Of Counsel: Donna L. Calvert, Regional Chief Counsel Social Security Administration, Philadelphia, PA.

## MEMORANDUM OPINION

ROBINSON, Chief Judge.

## I. INTRODUCTION

Plaintiff Deborah E. Cannon Borowka filed this action against defendant Jo Anne Barnhart,[1] Commissioner of Social Security, on April 16, 2004. (D.I. 1) Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of a decision by defendant denying her claim for disability income benefits under § 216(i) of the Social Security Act. (*Id.*) Currently before the court are the parties' cross motions for summary judgment. (D.I. 14) For the reasons stated below, the court will grant defendant's motion and deny plaintiff's motion.

## II. BACKGROUND

### A. Procedural Background

On August 21, 2001, plaintiff filed an application for disability insurance benefits due to back pain, congestive heart failure, angina and kidney problems. (D.I. 7 at 16–17) The claim was denied initially and upon review because it was determined that plaintiff's condition was not disabling at anytime prior to March 31, 2000.[2] (*Id.* at 16–17, 72) Plaintiff requested that she receive a hearing before an administrative law judge ("ALJ"); that hearing was held on April 10, 2003. (D.I. 7 at 16) On May 28, 2003, the ALJ denied plaintiff's claim. (*Id.* at 23) The ALJ found the following:

1. Plaintiff filed her complaint against Kenneth J. Apfel, however, Jo Anne Barnhart has since become the Commissioner of Social Security.

2. The record in this case contains medical records and reports for treatment and diagnoses after March 31, 2000. This evidence was not considered in this memorandum opinion because it is irrelevant, as plaintiff's burden was to establish a disability prior to March 31, 2000.

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 206(i) of the Social Security Act and is insured for benefits through March 31, 2000.

2. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The [ALJ found] the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The [ALJ] carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

6. The claimant has the following residual functional capacity: the claimant retained the residual functional capacity to perform a wide range of light exertional activities. Claimant is limited in that she requires the option to sit/stand at intervals of her choosing.

7. The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

9. The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical–Vocational Rules 202.20 and 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include unskilled jobs such as office helper, of which there are 550 regionally and 1,300,000 nationally; data exam clerk, of which there are 100 regionally and 10,000 nationally, and charge account clerk, of which there are 450 regionally and 50,000 nationally.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(*Id.* at 22–23). On February 17, 2004, the Appeals Council declined to review the ALJ's decision and his decision became the final decision of the Commissioner. (*Id.* at 5)

## B. Facts Evinced At The Administrative Law Hearing

Plaintiff is a 47 year old female who is five foot eight inches tall and weighs approximately 179 points.[3] (*Id.* at 38) Plain-

---

**3.** In the year prior to the ALJ hearing, plaintiff lost about 32 pounds; from 1996 to 2000 she weighed over 200 pounds. (*Id.* at 38)

tiff lives with her husband, whom she has been living with since 1996.[4] (*Id.* at 39, 61) Plaintiff has completed three and a half years in nursing school and one month of nurses' aide training.[5] (*Id.* at 40)

In the past, plaintiff has been employed as a counselor for Horizon, a home for mentally challenged individuals. (*Id.* at 40–42) As a counselor, plaintiff drove the clients to appointments, kept paperwork, ensured that the clients performed chores, ate daily, etc. (*Id.* at 42) Plaintiff has also been employed as a nurses' aide. (*Id.*)

In 1996, while in nursing school, plaintiff suffered "an attack or something" (coughing, shortness of breath, dizziness) and was taken to the hospital. (*Id.* at 43) Plaintiff began having chest pains, her feet and legs swelled up and she became "unstable." (*Id.*) Plaintiff was diagnosed with angina.[6] (*Id.* at 45) Plaintiff testified that in 1996 she had surgery to remove a growth from her kidney[7] and a hysterectomy. (*Id.* at 44, 45) According to plaintiff, she was seeing Dr. Corrin, a cardiologist, monthly to address her heart problems. (*Id.* at 44) During this time plaintiff has taking nitroglycerin, Lasix and Atenolol. (*Id.* at 46–47) All of this made her feel light-headed, dizzy, tired, confused, swollen and made her lose her hair. (*Id.* at 46–47) Plaintiff testified that she could not lift her arms above her head without getting dizzy. (*Id.* at 51–52) She could not squat, bend over without pain or go up stairs and had to stop working. (*Id.* at 52–53; 397) Plaintiff testified further that she has not worked since 1996, when she tried to resume working but was unable to work more than one week.[8] (*Id.* at 41)

In 1999, plaintiff, a full-time nursing student, dropped classes to become a part-time student, but eventually had to drop out of nursing school. (*Id.* at 48) After dropping out of school, plaintiff spent time going from one doctor or another getting tested, according to her, about every week and watching television. (*Id.* at 48–49) In 2000, plaintiff began using a walker to assist her walking. (*Id.* at 54)

At some point, plaintiff began suffering from back pain. (*Id.* at 44, 57, 63) Between 1996 and 2000 plaintiff claims she was taking Hydrocote, Percocet and Oxy-Contin and an anti-inflammatory for her back pain. (*Id.* at 59) She began seeing Dr. Labowitz, a rheumatologist, for her back pain. (*Id.*) She testified that in 2000 she was unable to undergo a scheduled back surgery because the anesthesiologist thought it was unsafe for her to be put under anesthesia. (*Id.* at 44, 57) Physical therapy only aggravated her back problems. (*Id.* at 57–58)

## C. Vocational Evidence

During the administrative hearing, the ALJ called William M. O'Toole, P.h.D. ("Dr.O'Toole"), a vocational expert, to testify about the exertional requirements necessary for plaintiff's prior work experience

---

4. Sometime in 1996 plaintiff's employment as a nurses' aide was terminated, she "lost her apartment" and needed a place to stay so she moved in with the man who is now her husband. (*Id.* at 61)

5. Although plaintiff finished about three and a half years of course work, it took her five years due to a leave of absence. (*Id.* at 40)

6. "Angina" is "[a] severe, often constricting pain . . . ." Stedman's Medical Dictionary 80 (27th ed.2002).

7. Plaintiff's medical records indicate she had surgery on her kidney in 1999 and/or 2000. (*Id.* at 192, 295, 296–97)

8. This date does not coincide with plaintiff's medical records, which indicate she was given approval to return to work in 1997. (*Id.* at 287–88)

as a nurses' aide and a Horizon counselor. (*Id.* at 64) Plaintiff's position as a nurses' aide is considered medium exertional level work that is semiskilled, having an SVP level of 4. (*Id.* at 65) Based on Dr. Singh's opinion of plaintiff's capabilities and limitations, there are no SVP level 4 jobs that plaintiff could perform.[9] (*Id.* at 66) There would, however, be jobs available to plaintiff within the range of light capability that included mostly sitting. (*Id.* at 66) These include "office helper, data examination clerk, and charge account clerk," all of which include a substantial amount of sitting.[10] (*Id.* at 66, 67)

### D. Medical Evidence

In March of 1996, plaintiff had a hysterectomy. (*Id.* at 164) After one day, plaintiff requested to be discharged from the hospital. (*Id.*) Records indicate that plaintiff was "in good health" and not experiencing problems with her respiratory or cardiovascular systems, her kidneys or her back.[11] (*Id.* at 165–66). In March and April of 1996, plaintiff had two chest x-rays, each showing no active disease. (*Id.* at 366) In May of 1996, plaintiff was admitted to St. Francis Hospital for cardiac catheterization to evaluate plaintiff's "chest dicomfort and palpitations." (*Id.* at 171) Plaintiff had a positive stress test.[12] (*Id.* at 171) After the catheterization the doctor

concluded that plaintiff had "normal coronary arteries," but that she may have "microvascular angina." (*Id.* at 177) On November 22, 1996, plaintiff complained to her doctor about having problems breathing at night. (*Id.* at 212) That same month, plaintiff underwent a chest x-ray that showed her heart was a normal size and shape, with no evidence of pneumonic consolidation or other pathological process. (*Id.* at 211) Dr. Singh, plaintiff's primary care physician, stated in his deposition that it is in 1996 that he became aware that plaintiff was suffering from congestive heart failure. (*Id.* at 286) Her condition was treated by Dr. Singh with medications, including Xanax for anxiety. (*Id.*)

Dr. Singh testified via deposition that plaintiff was being treated for high blood pressure, unstable angina and congestive heart failure as of February 1997. (*Id.* at 286) According to Dr. Singh, plaintiff's condition has not improved since he began treating her. (*Id.* at 287) In May of 1997, plaintiff was hospitalized and diagnosed with unstable angina and atherosclerotic cardiovascular disease. (*Id.* at 215) While in intensive care, plaintiff was on Heparin and intraveneous nitroglycerin, but both were discontinued when plaintiff left the hospital against medical advice.[13] (*Id.* at 216) Plaintiff was advised to return to the

---

9. Dr. Singh opined that plaintiff's former job would have an adverse effect on her health. (*Id.* at 374) In fact, he thought that any physical activity, even walking or sitting for an hour, would aggravate her symptoms. (*Id.*)

10. There are 500 office helper positions available regionally, 1,300,000 available nationally. (*Id.* at 66–67) There are 100 data examination positions available regionally and 10,000 available nationally. (*Id.*) There are 450 charge account clerk positions available regionally and 50,000 available nationally. (*Id.*)

11. Although Dr. Singh indicates in some of his records that plaintiff has suffered from

congestive heart failure and chronic back pain since 1995. (*Id.* at 373)

12. Plaintiff had no history of myocardial infarction; at this point she had a history of hypertension and signs of supraventricular tachycardia. (*Id.*)

13. In 1997, plaintiff and her former husband were in the middle of divorce proceedings. In the court opinion dividing up their assets, the court noted that in May of 1997, plaintiff had a heart attack although it is not clear from the medical evidence whether plaintiff actually had a heart attack. (*Id.* at 393)

hospital immediately if her chest pain was recurrent and to have an out-patient stress test. (*Id.* at 228) The stress test came back negative.[14] (*Id.* at 232) After this plaintiff's medication was switched from Procardia to Atenolol. (*Id.* at 235) This seemed to help her chest discomfort. (*Id.*) In June Dr. Singh estimated that, due to her conditions, plaintiff would be unable to work for six to twelve months. (Id. at 160) In December of 1997, Dr. Singh notified plaintiff that she could begin working again, as long as she started with part-time, light-duty work and, if she could tolerate it, worked up to more strenuous work. (*Id.* at 287–88)

Early in 1998, plaintiff was again referred to a cardiologist by Dr. Singh. (*Id.* at 234) The cardiologist concluded that, while plaintiff was not suffering from a cardiac problem, she probably had bronchitis; the cardiologist intended to review her chest x-ray and prescribe antibiotics.[15] (*Id.*) Plaintiff continued taking aspirin, Atenolol and Lasix. (*Id.*) In March of 1998, she went to the doctor complaining of back pain resulting in an inability to walk significant distances. (*Id.* at 269) In August of 1998, plaintiff had a 24–hour Holter Monitor during which time she complained of dizziness, but no associated arrhythmia was identified on the monitor. (*Id.* at 278) During this 24–hour monitor-ing, plaintiff experienced one episode of angina, but it did not result in any changes to her heart beat or arrhythmia. (*Id.*) In October of 1998, plaintiff began complaining of back pain that she rated as an 8 on a scale of 1 to 10. (*Id.* at 256) Also at this time, plaintiff was experiencing "rusty colored urine." (*Id.* at 253) During much of 1998 plaintiff repeatedly complained of shortness of breath and coughing. (*Id.* at 250–75)

In 1999 plaintiff was still complaining of back pain. (*Id.* at 203–05, 239) At first she was given Motrin and back stretching exercises. (*Id.* at 239) On March 2, 1999, a cyst was removed from plaintiff's right kidney.[16] (*Id.* at 294, 296–97) While in the hospital for kidney surgery, plaintiff's chest was X-rayed; it showed no evidence of congestive heart failure. (*Id.* at 303) In June, plaintiff got an MRI of her spine that showed a "concentric annular bulging at L4–5 and ... disc herniation and possible annualar tear suggesting a more acute process." [17] (*Id.* at 307) Late in 1999 plaintiff went to the doctor twice complaining of chest pain and tightness in her chest. (*Id.* at 198–99)

In January of 2000 plaintiff went to the doctor complaining of shortness of breath.[18] (*Id.* at 197)

14. During the stress test plaintiff was able to exercise on a treadmill at 65% of the maximum predicted heart rate. (*Id.* at 236)

15. The cardiologist indicated that plaintiff was smoking a pack of cigarettes a day and he would be prescribing Zyban to see if she could stop smoking. (*Id.* at 234)

16. Plaintiff's medical records mention a mass on her kidney and possible kidney disease as early as February 1999. (*Id.* at 241) Also, her medical records indicate that surgery and been scheduled and rescheduled more than once due to plaintiff's respiratory problems. (*Id.* at 241–43)

17. Plaintiff received a second opinion from a former doctor, Dr. Gopez, who agreed with this diagnosis. (Id. at 320) This doctor requested that she undergo physiotherapy and take anti-inflammatory medication in order to alleviate symptoms without surgery. (*Id.* at 320)

18. Over the next two months plaintiff would return to the doctor two more times complaining of shortness of breath. (*Id.* at 194–95)

## III. STANDARD OF REVIEW

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive," and the court will set aside the Commissioner's denial of plaintiff's claim only if it is "unsupported by substantial evidence." 42 U.S.C. § 405(g) (2002); 5 U.S.C. § 706(2)(E) (1999); *see Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3rd Cir. 1986). As the Supreme Court has held,

> "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established .... It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Fed. R.Civ.P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> Petitioners suggest, and we agree, that this standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g),

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3rd Cir.1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3rd Cir.1983)). Where, for example, the countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the Commissioner "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3rd Cir.1990).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), as amended, "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A) (2002).

In *Plummer v. Apfel*, 186 F.3d 422 (3rd Cir.1999), the Third Circuit outlined the applicable statutory and regulatory process for determining whether a disability exists:

> In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."
>
> The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a claimant is under a disability. In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied.[19] In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.[20]
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.[21] If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.[22] The claimant bears the burden of demonstrating an inability to return to her past relevant work.
>
> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.

*Id.* at 427–28 (internal citations omitted). If the Commissioner finds that a claimant is disabled or not disabled at any point in

---

**19.** It is undisputed that plaintiff is not engaged in gainful activity.

**20.** The ALJ found that plaintiff suffered from three severe impairments: (1) low back pain; (2) congestive heart failure; and (3) cardiomegaly. (*Id.* at 18)

**21.** The ALJ found that plaintiff did not suffer from any impairment equivalent to any of those assumed to be severe enough to prevent gainful employment. (*Id.* at 18)

**22.** The ALJ concluded that plaintiff could not perform her previous work as a nurses' aide or a Horizon counselor. (*Id.* at 20)

the sequence, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2002).

 The determination of whether a claimant can perform other work may be based on the administrative rulemaking tables provided in the Social Security Administration Regulations ("the grids"). *Cf. Jesurum v. Sec'y of Health & Human Services,* 48 F.3d 114, 117 (3rd Cir.1995) (noting use of the grids for determination of eligibility for supplemental social security income) (citing *Heckler v. Campbell,* 461 U.S. 458, 468–70, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983)). In the context of this five-step test, the Commissioner has the burden of demonstrating that the plaintiff is able to perform other available work. *See Bowen,* 482 U.S. at 146 n. 5, 107 S.Ct. 2287. In making this determination, the ALJ must determine the individual's residual functional capacity, age, education, and work experience. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(c) (2002). The ALJ then applies the grids to determine if an individual is disabled or not disabled. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(d) (2002).

If the claimant suffers from significant non-exertional limitations, such as pain or psychological difficulties, the ALJ must determine, based on the evidence in the record, whether these non-exertional limitations limit the claimant's ability to work beyond the work capacity obtained from reviewing the Social Security regulation "grids." *See* 20 C.F.R. § 404.1569a(c)-(d). If the claimant's non-exertional limitations are substantial, the ALJ uses the grids as a framework only and ordinarily seeks the assistance of a vocational specialist to determine whether the claimant can work. *See Santise v. Schweiker,* 676 F.2d 925, 935 (3rd Cir.1982); 20 C.F.R. pt 404, subpt. P, app. 2, § 200(d)-(e).

## B. Dr. Singh's Medical Opinion

 Plaintiff contends that the ALJ improperly rejected. Dr. Singh's medical opinion .that she was disabled prior to March 31, 2000. Treating physician reports can only be disregarded in the face of contrary medical evidence. *Rosario v. Massanari,* No. 00–653, 2001 WL 1180279, at *8 (D.Del. Sept. 26, 2001). Treating physician opinions can, however, be accredited more or less weight depending on the supporting explanations. *See id.* at *8. Here, Dr. Singh has stated that plaintiff has recurrent heart disease and back pain that renders her disabled.[23] The ALJ concluded that Dr. Singh's opinion was "inconsistent with ... the objective findings in the record prior to" March 2000. (D.I. 7 at 19)

The medical evidence supports the ALJ's conclusion. As of March 1996, plaintiff's medical records indicate she was "in good health" and had no cardiovascular problems. She had two chest x-rays that year, both showed no signs of disease. Although plaintiff had a catheterization and a positive stress test that year, she seemed to improve after the catheterization. Dr. Singh himself even indicated that he did not know plaintiff suffered from congestive heart failure and unstable angina until late in 1996. The next year plaintiff had a negative stress test and her

---

**23.** Dr. Singh filled out a "Medical Impairment Evaluation" form for plaintiff in 2002 in which he stated that plaintiff had been suffering from congestive heart failure, coronary artery disease and chronic back pain since 1995 and that her congestive heart failure and chronic back pain were disabling. (D.I. 7 at 373) However, Dr. Singh does not comment on whether or not plaintiff has been disabled since 1995, or just in 2002. (*Id.* at 373–80) Notably, Dr. Singh characterized plaintiff's condition as deteriorating.. (*Id.* at 376) From this, the ALJ reasonably concluded that Dr. Singh's statements on this form were not indicative of plaintiff's disability prior to March 2000. (*Id.* at 19)

medications began to relieve her chest pain. She was then cleared to try working part-time.[24] In 1999, her chest was x-rayed and showed no signs of heart disease. While helping plaintiff defer her student loans, Dr. Singh indicated that plaintiff had been disabled since January 2001. (D.I. 7 at 156)

Plaintiff argues that the opinions of the cardiologists who treated her show that they also thought she was disabled. One of the cardiologists, however, concluded that plaintiff did not have a cardiac problem, but bronchitis. Plaintiff had a Holter Monitor done, which came back negative for any arrythmia. Furthermore, there is no record of any other doctor finding that plaintiff was "disabled." At the most, the medical records from her two cardiologists indicate that plaintiff had recurrent symptoms from 1996 to 2001.

With respect to plaintiff's back, her medical records also support the ALJ's conclusion that she was not disabled prior to 1997. In 1999, Dr. Medinilla, the physician treating plaintiff's back, indicated that her low back pain was "nothing significantly serious." (D.I. 7 at 316) A year later she returned to Dr. Medinilla who gave her an injection of Marcaine and Depo–Medrol, which relieved her pain. (*Id.* at 315) After the injection, "[t]here was no evidence of focal weakness, atrophy or fascinculations . . . ." There was "[s]ensation to pin prick, touch and temperature was normal. The reflexes were briskly reactive and symmetrical. The range of motion of the dorsolumbar spine was full . . . ." (*Id.*) After this visit, Dr. Medinilla concluded that he would not need to see plaintiff regularly and that she should take Celebrex and

Tylenol for the pain. (*Id.*) It was not until June 2001, after the date of disability at issue in this case, that Dr. Medinilla recommended that plaintiff undergo back surgery. (*Id.* at 314)

In this case, the ALJ properly discounted Dr. Singh's opinion that plaintiff was disabled as of March 1995 because the opinion was unsubstantiated by the record.

### C. Plaintiff's Complaint's Of Pain And Medical Side Effects

▉ Plaintiff argues that the ALJ did not appropriately consider her subjective complaints with respect to pain and the side effects of her numerous medications and, had he done so, would have found her disabled prior to March 2000. When evaluating a plaintiff's complaints of pain, the ALJ is to consider whether plaintiff's subjective complaints are consistent with, and supported by, objective medical evidence. *See* 20 C.F.R. § 404.1529(a),(c)(3)-(4). Because the ALJ must conclude that a medical impairment is reasonably causing the symptoms and then evaluate the intensity of the symptoms, he must evaluate the plaintiff's ability to accurately describe her pain. *Rosario v. Massanari,* No. 00–653, 2001 WL 1180279, at *9 (D.Del. Sept. 26, 2001).

In this case, the ALJ found plaintiff's testimony regarding her pain and the side effects to be "exagerrated." (D.I. 7 at 19) The ALJ further found that there was no medical corroboration for plaintiff's complaints of the adverse side effects of her medication and that the medical records indicated only "moderate physical symp-

---

**24.** Plaintiff takes issue with the fact that the ALJ relied on this clearance in concluding that plaintiff was not disabled. Late in 1997, Dr. Singh told plaintiff she could begin working part-time because he thought "her condition [had] changed to the point where she would be able to work." (*Id.* at 288) Plaintiff testified that she was not able to handle work. Still, the ALJ could reasonably have relied on the fact that, in 1997, Dr. Singh thought plaintiff was well enough to gradually begin working again as contradicting the position that plaintiff has been "disabled" since 1995.

toms." (*Id.*) Plaintiff has failed to cite any medical evidence supporting her complaints with respect to her medications. There is only one reference to a change in her medications; in 1997 plaintiff was successfully switched from Procardia to Atenolol. (*Id.* at 235) This one reference is not enough from which to conclude that plaintiff's medications rendered her disabled, or that her medications when coupled with her medical conditions rendered her disabled. Likewise, there is no medical evidence to support plaintiff's claims of debilitating pain. While there is evidence of a medical basis for plaintiff's pain, plaintiff failed to cite evidence that her pain was as significant as she claimed. There are numerous accounts of complaints of pain and a diagnosis of angina (i.e., pain in her chest), but no medical evidence of pain so significant it is debilitating.[25] Therefore, the ALJ's conclusion that plaintiff was exaggerating her pain, and that the pain did not render her disabled was not contradictory to the weight of the medical evidence.

## V. CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 5th day of August, 2005, consistent with the memorandum opinion issued this date;

IT IS ORDERED that:

1. Plaintiff's motion for summary judgment (D.I. 12) is denied.

2. Defendant's motion for summary judgment (D.I. 14) is granted.

25. Notably, Dr. Singh cleared plaintiff to try to return to work even after her angina diag-

3. The Clerk of Court is directed to enter judgment for defendant and against plaintiff.